# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
# AT JACKSON
June 12, 2012 Session

## ROBIN PAUL CAGLE v. STATE OF TENNESSEE

**Appeal from the Circuit Court of Dyer County**
**No. 10-CR-212     Lee Moore, Judge**

**No. W2011-02509-CCA-R3-PC  - Filed August 1, 2012**

Robin Paul Cagle ("the Petitioner") filed a petition for post-conviction relief from his conviction of aggravated sexual battery, alleging that his guilty plea was constitutionally infirm and that it was entered due to the ineffective assistance of counsel. After a hearing, the post-conviction court denied relief, and this appeal followed. Upon our careful review of the record and relevant authorities, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment**
**of the Circuit Court Affirmed**

JEFFREY S. BIVINS, J., delivered the opinion of the Court, in which ROBERT W. WEDEMEYER and ROGER A. PAGE, JJ., joined.

Charles S. Kelly, Sr., Dyersburg, Tennessee, for the appellant, Robin Paul Cagle.

Robert E. Cooper, Jr., Attorney General and Reporter; J. Ross Dyer, Senior Counsel; and C. Phillip Bivens, District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Factual and Procedural Background

On January 4, 2011, the thirty-five-year-old Petitioner entered a guilty plea to a single count of aggravated sexual battery based on the Petitioner's fondling and kissing an eleven-year-old boy in May 2010. Pursuant to the plea agreement, the trial court sentenced the Petitioner as a Range I offender to the minimum term of eight years in the Tennessee Department of Correction, to be served at 100%. At the time the Petitioner entered his guilty plea, he was serving a probationary sentence for a prior offense of attempted aggravated sexual battery. As part of the plea agreement, the Petitioner waived his hearing on the probation revocation and agreed that his probation on the prior offense would be revoked.

Also as a part of the plea agreement, the trial court ordered that the sentence on the instant conviction be served concurrently to the sentence on the prior conviction.

Prior to the plea hearing, the trial court ordered that the Petitioner be referred to Pathways Behavioral Health Services for a forensic evaluation, including a determination of the Petitioner's competency to stand trial, his mental condition at the time of the offense, whether the Petitioner suffered from a drug or alcohol dependency, an assessment of his intellectual quotient ("I.Q."), and whether, at the time of the offense, the Petitioner "lacked the capacity to form the requisite culpable mental state to commit the offense." The trial court also ordered the Petitioner's lawyer to "provide pertinent information to Pathways for the . . . evaluations" and ordered Pathways to report its findings to the court. At the plea hearing, a transcript of which is included in the record, the only reference to the ordered evaluations was the prosecutor's statement that "[t]here was a competency evaluation of [the Petitioner] and we did get a report back that should be in the file dated November 11th from Pathways that found that he was competent." The referenced report was not made an exhibit to the guilty plea hearing.

On June 29, 2011, the Petitioner filed for post-conviction relief. The State responded and the post-conviction court conducted an evidentiary hearing. At the hearing, the State introduced into evidence a report dated November 11, 2010, from Pathways Behavioral Health Services ("the Report"). The Report included the following statements:

> After completion of the competency evaluation, Richard Drewery, Ph.D., has concluded that the [Petitioner] has sufficient present ability to consult with his attorney with a reasonable degree of rational understanding and a rational as well as factual understanding of the proceedings against him.

> After completion of the evaluation based on T.C.A. 39-11-501[1], it is Dr. Drewery's opinion that at the time of the commission of the acts constituting the offense, the [Petitioner] was able to appreciate the nature or wrongfulness of such acts.

> [The Petitioner] states he is not using any illegal substances or alcohol. Therefore no treatment is indicated in this area. Although no formal testing was performed, his intelligence appears to be mild mental retardation. In addition, the court order requested us to evaluate diminished capacity.

---

[1] "It is an affirmative defense to prosecution that, at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature or wrongfulness of the defendant's acts." Tenn. Code Ann. § 39-11-501(a) (2010).

Available evidence does not suggest that [the Petitioner] had a mental disease and/or defect that interfered with his capacity to form the requisite culpable mental state for aggravated sexual battery which is intentionally and knowingly.

(Footnote added).

At the post-conviction hearing, the Petitioner proffered Dr. Robert E. Murray, a psychiatrist, as an expert. During voir dire by the State, Dr. Murray acknowledged that he previously had not testified about a criminal defendant's competency to stand trial or his or her "competency . . . at the time they committed an offense." He stated that he understood his role as determining whether the Petitioner "understood what was happening when he pled guilty"; "whether or not his prior evaluation was adequate"; "whether that led to an adequate defense"; and "whether or not he had diminished capacity for understanding the nature of his wrong." Dr. Murray explained his understanding of diminished capacity as follows: "does the individual have the capacity to control his actions, does he have the capacity to understand the consequences of his actions." Dr. Murray explained his understanding of culpable mental state as "the individual has the awareness that what he's done is wrongful." He added that he understood "mens rea" as meaning "[t]o have the mind-set to do that wrongful thing." He evaluated the Petitioner several days prior to the post-conviction hearing through a ninety-minute interview at the prison where the Petitioner was housed. Although the post-conviction court expressed some reservations about Dr. Murray's qualifications in the area in which he was proffered as an expert, the post-conviction court allowed Dr. Murray to testify.

Dr. Murray testified that, in addition to interviewing the Petitioner, he reviewed the Report. Dr. Murray described the Report as "lacking" and stated that the Report indicated that I.Q. testing was not performed.[2] As to his examination and diagnoses of the Petitioner, he testified that the Petitioner suffers from mild mental retardation and that he was functioning at the level of an eleven-year-old child. Dr. Murray clarified that the Petitioner "can appear to be functioning normal if you don't really sort of ask him the right kinds of questions and enough questions." However, the Petitioner's "ability to understand abstract thought was particularly inadequate, compared with non-mentally retarded individuals." Dr.

---

[2] The Petitioner attempts to make much of the fact that Pathways did not perform any I.Q. "testing." However, the trial court's order for an evaluation did not require "testing." The order merely states that the staff at Pathways "shall make an *assessment* of the [Petitioner's] intellectual quotient." (Emphasis added). Pathways arrived at the same assessment that Dr. Murray did: that the Petitioner is mildly mentally retarded.

Murray also diagnosed the Petitioner as having Tourette syndrome,[3] which he explained was strongly related to inappropriate sexual behavior. Additionally, the Petitioner exhibited "elements of obsessive-compulsive disorder." According to Dr. Murray, Pathways failed to diagnose either of these conditions.

When asked by the Petitioner's counsel whether, in Dr. Murray's opinion, the Petitioner suffered from a mental condition that reduced his culpability in committing the aggravated sexual battery, Dr. Murray responded, "Yes." When asked about the Report's conclusion on diminished capacity, Dr. Murray responded as follows:

> I believe that [the Petitioner's] capacity to fully appreciate what was going on was very clearly affected by his [T]ourette[']s disorder, with his -- his history of inappropriate sexual behavior, which I noted is genetically believed to be -- mostly to be genetically determined. In some cases, there's also a role for infection. It's generally -- there's no one that believes that it's sort of a process of, you know, reaction to environmental circumstances. So I think that addresses, to some degree, the degree of culpability of how fully capable was he [sic] of making a rational decision, with thinking about consequences and reacting to those possible consequences.

Dr. Murray also opined that the Petitioner "would have a great deal of difficulty with" understanding the guilty plea.

On cross-examination, Dr. Murray acknowledged that he also had performed no "formal" I.Q. testing on the Petitioner. He further acknowledged that, while Pathways conducted no formal I.Q. testing on the Petitioner, the Report indicated that the Petitioner suffered from mild mental retardation. Dr. Murray also explained that the Petitioner knew that the actions he took which resulted in his conviction were wrong, but asserted that the Petitioner did not appreciate the extent of their wrongfulness. Dr. Murray also acknowledged that the Petitioner "knew he had contact with the [victim]" and that "[h]e did know of his participation." He explained, however, that the Petitioner lacks "a really good understanding of the difference between himself, at age 36, and a boy that's age 11 [because] he perceives of himself as functioning kind of like a 13-year-old."

The Petitioner's trial lawyer ("Trial Counsel") testified that he met with the Petitioner and the Petitioner's mother several times before the plea hearing. Trial Counsel's office had

---

[3] This medical condition is spelled various ways in the record. We have chosen to use the spelling and capitalization utilized by the National Institute of Neurological Disorders and Stroke, a division of the National Institutes of Health.

represented the Petitioner in his prior sex offense case. Trial Counsel stated that the Petitioner already had been sentenced to lifetime supervision as a result of his prior conviction, but he explained to the Petitioner that the instant conviction also carried the lifetime supervision requirement. He also explained that the plea-bargain included an eight-year sentence that would have to be served at one hundred percent. According to Trial Counsel, the Petitioner admitted that he had fondled and kissed the victim.

The Petitioner's mother provided to Trial Counsel records of past evaluations that had been conducted on the Petitioner. These evaluations indicated that he had a low I.Q. Trial Counsel stated that, even before he reviewed the evaluations, he could tell that the Petitioner had a mental disability. Accordingly, he requested that the trial court order mental evaluations. Trial Counsel stated that he knew that Pathways did not conduct I.Q. testing and that was why he provided previous I.Q. testing results to Pathways. Specifically, Trial Counsel provided Pathways nine pages of information about the Petitioner for their use in conducting the court-ordered evaluations. The information provided by Trial Counsel was admitted as a collective exhibit. The exhibit contained background information about the Petitioner, including a psychological evaluation conducted by the Dyersburg City Schools when the Petitioner was eighteen years old which indicates a "Full Scale IQ" of 65. The evaluation concluded that the testing results "indicate[] that this student meets the criteria for Mental Retardation services at this time."

When asked whether he considered obtaining an independent evaluation of the Petitioner, Trial Counsel responded, "No. Because based on my conversations with him all during the pendency of this case, even though he has a low I.Q., it was my opinion that he understood the difference between right and wrong. He knew. He actually told me he knew." Trial Counsel also stated that "Pathways had already adjudged him competent to stand trial" in conjunction with the previous case.

Trial Counsel testified that he did not know if the Petitioner could read the guilty plea document, but stated that he read it to the Petitioner. He explained to the Petitioner the questions that the trial judge would be asking him. Trial Counsel reviewed these matters with the Petitioner while in the presence of the Petitioner's mother. Trial Counsel also explained to the Petitioner that he would be going to jail for eight years and that he would have to serve his entire sentence. Trial Counsel told the Petitioner that the location of his imprisonment would be up to the sheriff and that he could be transferred to the Tennessee Department of Correction to serve his sentence. According to Trial Counsel, the Petitioner understood what he was told and what would be happening to him.

On cross-examination, Trial Counsel stated that the Petitioner's prior case was in 2007 and resulted in a guilty plea to attempted aggravated sexual battery with a six-year sentence on community corrections after serving one day in jail. According to Trial Counsel,

Pathways performed an evaluation in conjunction with that case and determined that the Petitioner understood the nature of the process, understood the charges, understood the consequences, and could participate with counsel in his defense. Pathways also determined that the Petitioner was able to appreciate the nature or wrongfulness of the act and that the Petitioner's intelligence appeared to be mild mental retardation. As to diminished capacity, Pathways determined that "[t]he evidence does not suggest that he has a mental disease or defect that interfered with his capacity to form the requisite culpable mental state for aggravated sexual battery." Trial Counsel stated that Pathway's findings in the instant case mirrored their previous findings in 2007.

Janet Cagle, the Petitioner's mother, testified that the Petitioner was (at the time of the post-conviction hearing), thirty-six years old. He continued to live with her and his father, her husband. She learned that the Petitioner was mentally disabled when he was about eight years old. In addition to his mental disability, the Petitioner had "always been hyperactive." He had been drawing disability since becoming eighteen years old.

Ms. Cagle understood that if the Petitioner took the plea-bargain offer in the instant case he would be going to prison for eight years. She did not know that, before he took the plea, they could have obtained, at state expense, a different doctor to evaluate the Petitioner.

Farris Cagle, the Petitioner's father, also testified that he had not known that they could have obtained an independent evaluation of the Petitioner prior to his guilty plea. He also testified that he had never heard the Petitioner diagnosed with Tourette syndrome until Dr. Murray evaluated the Petitioner.

The Petitioner testified that he currently was housed in the state penitentiary in Lake County in protective custody. The Petitioner explained that he had been "jumped" twice. He remembered that Trial Counsel told him that he would "probably get eight, you know, eight at a hundred." He did not remember where Trial Counsel told him he would be going. He also stated that he thought he would be returning home after his plea. He testified that he did not understand what he was doing during the guilty plea hearing. He stated that he could not read the plea agreement but that he signed it because Trial Counsel told him to sign it.

The post-conviction court took the matter under advisement and subsequently issued a comprehensive order denying relief. The court reviewed all of the proof adduced at the hearing and determined that the Petitioner had failed to prove either that Trial Counsel was deficient or that he was prejudiced by Trial Counsel's performance. The court also rejected the Petitioner's claim that his guilty plea was constitutionally infirm. The post-conviction court concluded:

The difficult thing for the Court in this case is that we have a young man who is mildly retarded and for the first time in his life is away from home and by himself in prison. The Court wishes that there was some way to take him off the streets other than placing him in prison, but with the competency evaluations, it would have to be done by some method other than post-conviction relief.

On appeal, the Petitioner argues that Trial Counsel was ineffective in failing to provide Pathways "with the pertinent mental evaluations or did not make sure that the previous reports were in fact received by Pathways" and was also ineffective in failing to obtain an independent evaluation of the Petitioner. He contends that he would not have entered a plea of guilty had Trial Counsel "provided adequate medical proof of his mental insufficiencies." The Petitioner also asserts that he did not enter his guilty plea knowingly, intelligently, and voluntarily.

## Standard of Review

Relief pursuant to a post-conviction proceeding is available only where the petitioner demonstrates that his or her "conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103 (2006). To prevail on a post-conviction claim of a constitutional violation, the petitioner must prove his or her allegations of fact by "clear and convincing evidence." Tenn. Code Ann. § 40-30-110(f) (2006). See Momon v. State, 18 S.W.3d 152, 156 (Tenn. 1999). This Court will not overturn a post-conviction court's findings of fact unless the preponderance of the evidence is otherwise. Pylant v. State, 263 S.W.3d 854, 867 (Tenn. 2008); Sexton v. State, 151 S.W.3d 525, 531 (Tenn. Crim. App. 2004). We will defer to the post-conviction court's findings with respect to the witnesses' credibility, the weight and value of their testimony, and the resolution of factual issues presented by the evidence. Momon, 18 S.W.3d at 156. With respect to issues raising mixed questions of law and fact, however, including claims of ineffective assistance of counsel, our review is de novo with no presumption of correctness. See Pylant, 263 S.W.3d at 867-68; Sexton, 151 S.W.3d at 531.

## Analysis

We agree with the post-conviction court that this case presents a very unfortunate situation. Nevertheless, we also are constrained to agree with the post-conviction court that the Petitioner has failed to demonstrate that he is entitled to post-conviction relief.

*Ineffective Assistance of Counsel*

The Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution guarantee a criminal defendant the right to representation by counsel at trial.[4]  Both the United States Supreme Court and the Tennessee Supreme Court have recognized that this right is to "reasonably effective" assistance, which is assistance that falls "within the range of competence demanded of attorneys in criminal cases."  Strickland v. Washington, 466 U.S. 668, 687 (1984); see also Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975).  The deprivation of effective assistance of counsel at trial presents a claim cognizable under Tennessee's Post-Conviction Procedure Act.  See Tenn. Code Ann. § 40-30-103; Pylant, 263 S.W.3d at 868.

In order to prevail on a claim of ineffective assistance of counsel, the petitioner must establish two prongs:  (1) that counsel's performance was deficient and (2) that the deficient performance prejudiced the defense.  See Strickland, 466 U.S. at 687; Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996).  The petitioner's failure to establish either prong is fatal to his or her claim of ineffective assistance of counsel.  Goad, 938 S.W.2d at 370.  Accordingly, if we determine that either prong is not satisfied, we need not consider the other prong.  Id.

To establish the first prong of deficient performance, the petitioner must demonstrate that his lawyer's "acts or omissions were so serious as to fall below an objective standard of 'reasonableness under prevailing professional norms.'"  Vaughn v. State, 202 S.W.3d 106, 116 (Tenn. 2006) (quoting Strickland, 466 U.S. at 688)).  Our Supreme Court has explained:

> [T]he assistance of counsel required under the Sixth Amendment is counsel reasonably likely to render and rendering reasonably effective assistance.  It is a violation of this standard for defense counsel to deprive a criminal defendant of a substantial defense by his own ineffectiveness or incompetence. Defense counsel must perform at least as well as a lawyer with ordinary training and skill in the criminal law and must conscientiously protect his client's interest, undeflected by conflicting considerations.

Baxter, 523 S.W.2d at 934-35 (quoting Beasley v. United States, 491 F.2d 687, 696 (6th Cir. 1974)).  When a court reviews a lawyer's performance, it "must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's conduct, and to evaluate the conduct from the perspective of counsel at that time."  Howell

---

[4] The Sixth Amendment right to counsel is applicable to the States through the Fourteenth Amendment to the United States Constitution.  See Gideon v. Wainwright, 372 U.S. 335, 342 (1963); State v. Howell, 868 S.W.2d 238, 251 (Tenn. 1993).

v. State, 185 S.W.3d 319, 326 (Tenn. 2006) (citing Strickland, 466 U.S. at 689). Additionally, a reviewing court "must be highly deferential and 'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" State v. Honeycutt, 54 S.W.3d 762, 767 (Tenn. 2001) (quoting Strickland, 466 U.S. at 689). We will not deem counsel to have been ineffective merely because a different strategy or procedure might have produced a more favorable result. Rhoden v. State, 816 S.W.2d 56, 60 (Tenn. Crim. App. 1991). We recognize, however, that "deference to tactical choices only applies if the choices are informed ones based upon adequate preparation." Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992) (citing Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982)).

As to the prejudice prong, the petitioner must establish a "reasonable probability that but for counsel's errors the result of the proceeding would have been different." Vaughn, 202 S.W.3d at 116 (citing Strickland, 466 U.S. at 694). In the context of a guilty plea, our analysis of this prong

> focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process. In other words, in order to satisfy the "prejudice" requirement, the [petitioner] must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial.

Hill v. Lockhart, 474 U.S. 52, 59 (1985). See also Calvert v. State, 342 S.W.3d 477, 486 (Tenn. 2011).

The Petitioner contends, in essence, that Trial Counsel was deficient in failing to seek and/or present more vigorously evidence that the Petitioner could not be tried or held criminally liable for the offense of aggravated sexual battery. The proof at the post-conviction hearing, however, established that Trial Counsel was aware of the Petitioner's mental infirmities and his past evaluations. Moreover, the proof also demonstrates that Trial Counsel made this information available to Pathways. Based on his knowledge of the Petitioner, the evaluations, and the legal requirements for avoiding criminal responsibility on the basis of a mental disease or defect, he made a reasoned decision to not pursue further mental evaluations. The Petitioner has failed to establish that Trial Counsel's decision fell below the standard of competence expected of criminal defense lawyers.

He also has failed to establish that further mental evaluations would have inured to his benefit. A criminal defendant may be found not guilty by reason of insanity only if the defendant proves, by clear and convincing evidence, that, "at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature or wrongfulness of the defendant's acts." Tenn.

Code Ann. § 39-11-501(a) (2010). Clear and convincing evidence is proof which leaves no serious or substantial doubt about the correctness of the conclusions drawn therefrom. State v. Kennedy, 152 S.W.3d 16, 18 (Tenn. Crim. App. 2004). At the post-conviction hearing, Dr. Murray opined that the Petitioner understood that his actions vis-a-vis the victim were wrong, but did not understand the extent to which his actions were wrong. This proof is not sufficient to establish the affirmative defense of insanity. Therefore, the Petitioner has failed to establish that Trial Counsel was deficient in not further pursuing this defense.

Psychiatric testimony also may be admissible to prove that "the defendant lacks the capacity, because of mental disease or defect, to form the requisite culpable mental state to commit the offense charged." State v. Hall, 958 S.W.2d 679, 689 (Tenn. 1997).[5] The Petitioner was charged with aggravated sexual battery, defined as "unlawful sexual contact with a victim by the defendant or the defendant by a victim [where] [t]he victim is less than thirteen (13) years of age." Tenn. Code Ann. § 39-13-504(a)(4) (2010). "Sexual contact" is further defined as

> the intentional touching of the victim's, the defendant's, or any other person's intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's, the defendant's, or any other person's intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification.

Id. § 39-13-501(6) (2010). This Court has noted that "[t]he various elements of aggravated sexual battery contain distinct culpable mental states." State v. Julio Ramirez, No. M2009-01617-CCA-R3-CD, 2011 WL 2348464, at *20 (Tenn. Crim. App. June 8, 2011), perm. app. denied (Tenn. Sept. 21, 2011). Thus, the element of sexual contact "must be accomplished 'intentionally' with 'the purpose of sexual arousal or gratification.'" Id. (quoting Tenn. Code Ann. § 39-13-501(6) (2003)). However, "[b]ecause the statute is silent as to the culpable mental state as to the victim's age, a showing of recklessness suffices to establish a defendant's culpability as to the victim's age." Id.

Although Dr. Murray testified generally that, in his opinion, the Petitioner suffered from a mental condition that reduced his culpability in committing the instant offense, Dr. Murray did not testify that the Petitioner lacked the capacity to touch the victim intentionally and with the requisite purpose. Nor did Dr. Murray testify that the Petitioner lacked the capacity to act recklessly in determining the victim's age. Rather, the thrust of Dr. Murray's testimony was that the Petitioner did not fully understand the extent to which his actions in

---

[5] This theory of defense is sometimes referred to as "diminished capacity." See Hall, 958 S.W.2d at 688-89.

-10-

touching the victim were wrong or the extent to which his actions were damaging to the victim. Such proof, however, does not negate the culpable mental state required for aggravated sexual battery. Accordingly, the Petitioner has failed to demonstrate that Trial Counsel was deficient in not further pursuing this theory of defense.[6]

In sum, the Petitioner has failed to prove by clear and convincing evidence that he is entitled to post-conviction relief from his guilty plea on the basis of ineffective assistance of counsel.

*Validity of Guilty Plea*

The Petitioner also contends that, due to his mental retardation, his guilty plea is constitutionally infirm. We disagree.

To be valid, a guilty plea must be entered knowingly, voluntarily, and intelligently. See Boykin v. Alabama, 395 U.S. 238, 242-44 (1969); State v. Mackey, 553 S.W.2d 337, 340 (Tenn. 1977). A plea meets constitutional muster when the defendant understands both what the plea connotes and its consequences, Blankenship v. State, 858 S.W.2d 897, 904 (Tenn. 1993) (citing Boykin, 395 U.S. at 244), and makes a voluntary and intelligent choice from the alternative courses of action available to plead guilty. Jaco v. State, 120 S.W.3d 828, 831 (Tenn. 2003) (citing North Carolina v. Alford, 400 U.S. 25, 31 (1970)). In Mackey, our Supreme Court set forth the procedure that a trial court should follow when accepting a guilty plea in order to ensure that a defendant's plea is knowing, voluntary, and intelligent. Mackey, 553 S.W.2d at 341; see also Tenn. R. Crim. P. 11(b). A trial court must "substantially comply" with this procedure. State v. Newsome, 778 S.W.2d 34, 38 (Tenn. 1989).

As set forth above, a petitioner in a post-conviction proceeding must establish his right to relief by clear and convincing evidence. Although Dr. Murray testified that, in his opinion, the Petitioner would have a great deal of difficulty understanding his guilty plea, other proof in the record contradicts this conclusion. Pathways determined that the Defendant was competent to stand trial. Trial Counsel testified that he read the plea agreement to the Petitioner and explained what was going to happen. Trial Counsel was confident that the Petitioner understood the proceedings. Indeed, the Petitioner testified that Trial Counsel explained to him that he would "probably get eight . . . at a hundred." The transcript of the guilty plea hearing also indicates that the Petitioner understood the

---

[6] In his brief to this Court, the Petitioner also refers to Tennessee Code Annotated section 40-35-113(8) (2010) in his argument regarding diminished culpability resulting from a mental condition. However, section -113(8) applies only to reduce the length of a defendant's sentence. In the Petitioner's case, he was sentenced to the minimum term. Therefore, section -113(8) had no applicability to the Petitioner's sentence.

proceedings. We note that the Petitioner responded appropriately to the trial court's questions, even asking for clarification when he did not understand a question. Moreover, the trial court obviously had no concerns when faced with the Petitioner's answers and demeanor. Also, significantly, the Petitioner previously had entered a guilty plea to a similar offense. Accordingly, he was familiar with the procedure. The post-conviction court also had the benefit of listening to and observing the Petitioner testify at the post-conviction hearing and nevertheless determined that the Petitioner's plea was constitutionally sound. In short, the Petitioner has simply failed to establish by clear and convincing evidence that he is entitled to relief on this basis.

We, again, reiterate that this case presents a very unfortunate situation. Nevertheless, the Petitioner has failed to satisfy the requirements for post-conviction relief. Accordingly, we are constrained to affirm the post-conviction court's denial of relief.

**Conclusion**

For the foregoing reasons, we affirm the judgment of the post-conviction court.

_____
JEFFREY S. BIVINS, JUDGE