IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
April 6, 2004 Session
**STATE OF TENNESSEE v. JOY KENNEDY**

**Direct Appeal from the Circuit Court for Franklin County**
**No. 14176     Thomas W. Graham, Judge**

---

**No. M2003-01745-CCA-R3-CD - Filed June 14, 2004**

---

The Defendant, Joy Kennedy, was found guilty by a jury of vehicular homicide, two counts of reckless aggravated assault, and reckless driving. However, the trial court granted the Defendant's motion for judgment of acquittal, concluding that she had established the defense of insanity by clear and convincing evidence. The State appealed on the ground that the trial court erred by granting the Defendant's motion for judgment of acquittal. The sole issue on appeal is whether a reasonable juror could have concluded that the defense of insanity had not been established by clear and convincing evidence. We hold that no reasonable juror could have failed to find that the Defendant was legally insane at the time of the crimes. Therefore, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

DAVID H. WELLES, J., delivered the opinion of the court, in which ALAN E. GLENN and ROBERT W. WEDEMEYER, JJ., joined.

H. Thomas Parsons and Eric J. Burch, Manchester, Tennessee, for the appellee, Joy Kennedy.

Paul G. Summers, Attorney General and Reporter; Elizabeth T. Ryan, Assistant Attorney General; J. Michael Taylor, District Attorney General; and Steven M. Blount, for the appellant, State of Tennessee.

**OPINION**

On October 23, 2001, the Defendant, a forty-two year old single woman who lived in Chattanooga, was at the home of her parents in Winchester. The purpose of her visit was to pick up her car after having had the engine rebuilt. She got into an argument with her parents that evening and was upset when she left their home at approximately 7:45 p.m. Her parents followed her to a nearby gas station, where the Defendant filled up her car's tank, but did not pay for the gas. She left in a hurry, squealing her tires and going toward downtown Winchester.

Several witnesses saw the Defendant's car speeding on North High Street going toward town. Terry Evenson, who saw the Defendant's car from his front yard, estimated that she was going ninety

to one hundred miles per hour. Elbert and Ina Hill were sitting in their car at a four-way stop at the intersection of High Street and Second Avenue. They saw the Defendant run the stop sign without even slowing down, and Mr. Hill estimated the Defendant's car was going about seventy miles per hour through town. Rhonda Wilkinson was also stopped at that intersection, and she also witnessed the Defendant run through the four-way stop. She estimated that the Defendant was traveling at approximately seventy-five miles per hour. Ann Campbell saw the Defendant's car run through the red light at the intersection of High Street and First Avenue Northwest.

Cynthia Nunley, Marty Sons, and Joshua Sons, Marty's ten-year-old son, were riding in Ms. Sons' Geo Metro. They were stopped at the red light at the intersection of High Street and First Avenue Southwest. When the light turned green, they pulled out into the intersection. The Defendant ran the red light and crashed into Ms. Son's car. Ms. Nunley, who was driving Ms. Sons' car, had no memory of the collision. She woke up in pain at the hospital. She underwent two weeks of physical therapy for torn cartilage in her knee. She testified that her neck and knee were still damaged from the wreck. Marty Sons, who was riding in the passenger seat, suffered bruising from her seatbelt and a severe hematoma on her leg where it hit the gearshift. Joshua Sons, who was riding in the back seat behind his mother, was airlifted to Vanderbilt Hospital. Although he was wearing his seatbelt, he died as a result of blunt-force injuries to his head, neck, chest, back, and spinal cord.

The Defendant presented the testimony of three mental health experts. They each testified that the Defendant suffered from a severe mental disease, specifically bipolar disorder with psychotic episodes. They opined that, at the time of the wreck, the Defendant was delusional and was unable to appreciate the nature or the wrongfulness of her conduct. Defense counsel also elicited testimony from several witnesses who heard the Defendant make strange or bizarre statements before and after the accident, which the experts explained were consistent with their diagnoses.

Based on this evidence, the jury convicted the Defendant of vehicular homicide, two counts of reckless aggravated assault, and reckless driving. In so doing, the jury implicitly rejected the defense of insanity. The trial judge, however, granted the Defendant's motion for judgment of acquittal, finding that the defense of insanity had been established by clear and convincing evidence. From this order the State appeals pursuant to Tennessee Rule of Appellate Procedure 3(c). See also Tenn. R. Crim. P. 29(c).

Tennessee's insanity statute provides as follows:

(a) It is an affirmative defense to prosecution that, at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature or wrongfulness of such defendant's acts. Mental disease or defect does not otherwise constitute a defense. The defendant has the burden of proving the defense of insanity by clear and convincing evidence.

(b) As used in this section, "mental disease or defect" does not include any abnormality manifested only by repeated criminal or otherwise antisocial conduct.

(c) No expert witness may testify as to whether the defendant was or was not insane as set forth in subsection (a). Such ultimate issue is a matter for the trier of fact alone.

Tenn. Code Ann. § 39-11-501. Under the statute, the insanity defense applies only when the defendant has a severe mental disease or defect that results in the defendant being "unable to appreciate the nature or wrongfulness" of his or her actions. Id. § 39-11-501(a). Furthermore, insanity is an affirmative defense, and as such, the defendant bears the burden of proving the defense by clear and convincing evidence. See id. "Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n.3 (Tenn. 1992).

Much evidence was introduced at trial that called into question the Defendant's ability to appreciate the nature or wrongfulness of her conduct. Her father, Mike Kennedy, testified about the Defendant's background and mental health history, as well as her state of mind on the night of the accident. At the time of the wreck, the Defendant was a revenue agent for the United States Internal Revenue Service. Mr. Kennedy said that his daughter had lived on her own in Chattanooga for fourteen or fifteen years. She graduated with highest honors from Tennessee Tech University and received a Master's Degree from the University of Tennessee at Chattanooga. The Defendant dropped out of law school after one term because she suffered from depression. Her father explained that she began to have manic depressive episodes at this time. She developed delusions that the water supply in Cowan, where the family lived at that time, was poisoned and their house was "bugged" with electronic eavesdropping devices. Therefore, she spent a few nights with neighbors, and, when she returned home, she barricaded herself in a back bedroom. At that point, which was sometime in 1986, their family doctor, a Dr. Stensby, had the Defendant committed to Middle Tennessee Mental Health Institute, where she stayed for two months.

When the Defendant was released from the hospital, she remained in a depressed state. However, she went to work for the I.R.S. It was not until 1997 that she experienced what Mr. Kennedy described as "a break in the illness." As a result, she was committed by her doctor, a Dr. McGee, to Moccasin Bend Mental Health Institute for a month. She was recommitted for another month after a crisis team determined that her status had not improved. Mr. Kennedy testified that, about this time, the Defendant made statements about "wanting to go to Washington to straighten the president out." She was subsequently released from the hospital and continued living on her own. After the terrorist attack on September 11, 2001, the Defendant came home every weekend. She was depressed and did not want to see or hear anything about the 9/11 tragedy. She also began smoking small cigars, which her father said was "out of character for her."

Mr. Kennedy also testified that, before the Defendant left his house on the night of the accident, she was very upset. She said that she was "no longer [their] little daughter." She accused her parents of not understanding her or knowing her fully. She also claimed that John F. Kennedy

was still alive, and he was the antichrist. She stated that she was going to bear a child who would be a great world leader. She also said that people "just needed to go by faith and love and not necessarily by the precepts of any church." At the gas station, when Mr. Kennedy saw the Defendant pumping gas into her car, he asked whether she had already inserted her credit card into the machine. She replied, "No, God's going to take care of my gas." Mr. Kennedy also explained that the reason the Defendant's car had been in the shop was that she had failed to put any oil in the engine, and the engine had to be rebuilt.

The Defendant also presented evidence that, shortly after the accident, she said irrational things and behaved strangely. Joshua Hammer, who witnessed the crash on the night of October 23, 2001, went to the Defendant's car to see if she was injured. He smelled gasoline, so he advised the Defendant that they should get away from the car because it could catch fire. The Defendant responded, "Just let it." Mr. Hammer told the Defendant that she could be killed, and she replied, "I don't care." When Mr. Hammer saw that the Defendant had a dog in the car with her, he tried to get the dog out of the vehicle. The Defendant became very angry and said, "Keep your hands off my fucking dog." When the Defendant got out of her car, she stumbled around, looking "confused" and "lost." Mr. Hammer tried to help her into the back seat of a police car, but the door was locked. The Defendant then began frantically jerking on the door, saying, "Just let me in here. I just want to get in. I just want to get in." She then began to curse the car and its door.

Ty Brazier, one of the police officers who responded to the crash scene, testified that he had to mace the Defendant because she was trying to kick out the back windows of the patrol car in which she was sitting. When he asked her where she was from, she replied, "Out of this universe."

Marty Sons, one of the victims, testified that she was able to observe the Defendant when they were both at the hospital. She testified that she heard the Defendant say "she didn't care what happened" and "she wished she could have killed herself." Ms. Sons described the Defendant as "hostile," "very angry," and "hollering" for her parents.

In the statement the Defendant gave to the police on the day after the accident, she maintained that she was "not crazy." She told them that she was "not taking any drugs" because she did not need them anymore. She trusted in God and the Holy Spirit to take care of her. One of the officers asked her how long she had been off her medication, and she replied that she quit taking it "about two days ago." She also claimed to have "supernatural strength" "based on [her] belief in Jesus Christ." She told the officers that she "probably can kill somebody with [her] fingers," but she did not want to.

Dr. Terry Holmes, a psychiatrist at Moccasin Bend Mental Health Institute, testified that he began treating the Defendant on October 25, 2001, two days after the accident. She was committed to Moccasin Bend for almost two months, after which the doctor treated her on an outpatient basis. Dr. Holmes diagnosed the Defendant as suffering from "bipolar one disorder manic with psychosis," and he determined that there was a history of bipolar disorder in the Defendant's family. A person suffering from this disease would have long periods where she is in an "abnormal mood." Her

thoughts would race, she would be disorganized and extremely talkative, and she would have a decreased need for sleep. Such a person would have a loss of judgment, an increase of energy, and an inability to focus. Because the Defendant was also plagued by psychosis, she was out of touch with reality. Dr. Holmes explained that this condition often is characterized by "a distortion in one's perception of how the world is made up," and "falsely held belief[s]."

Dr. Holmes characterized the Defendant as a typical psychotic; she had poor hygiene, she was irritable, she was situationally unaware, she was disorganized, and she was not well-oriented to her circumstances. He cited her delusions as clear evidence of her psychosis. For example, the doctor cited her false beliefs that the water in Cowan was poisoned, that she was pregnant and would birth "the savior of the race," that President Kennedy was alive and the mastermind behind the 9/11 attacks, and that bipolar disorder was not real, as delusions that are typical with psychosis. According to the doctor, the Defendant began her "decompensation" at least two weeks before the accident. At that time, she began drinking several gallons of water a day. One night she came home and "trashed" her parents' house and was running around naked, "experiencing the freedom of a child." Dr. Holmes testified that, on the night of the accident, the Defendant had a falsely-held belief that her car could fly. In his words, "she thought God would make her fly right over the other car." She told the mental health team that evaluated her, "I felt a tinge of sadness for the boy's family, but the boy is with God. All children go to God. If the parents are believers they will be with him soon." In the opinion of Dr. Holmes, the Defendant "has a severe mental illness," and, on the night of the accident, she lacked the ability to distinguish right from wrong because she was in a psychotic state. He stated that at the time of the accident, she could not appreciate the nature or wrongfulness of her actions.

Dr. Joe Mount, a psychologist at Middle Tennessee Mental Health Institute, testified that the Defendant was in his care from April 24 through May 9, 2002. He also determined that the Defendant suffered from bipolar disorder and psychosis. He explained that her particular mental problems would manifest themselves in an elevated, irritable mood that would last over one week, a decreased need for sleep, loquaciousness, difficulty concentrating, racing thought patterns, plus hallucinations or delusions. Dr. Mount testified that he thought he remembered evidence in the Defendant's record that, for several days prior to the accident, she had not taken her medication. Dr. Mount opined that the Defendant's manic behavior at the accident scene, as well as her beliefs that God would pay for her gasoline and God would pull her car up over the other car, were consistent with her bipolar disorder and psychosis.

Dr. Mount administered several psychological tests to the Defendant. The results of one of the tests revealed that the Defendant was stable and able to understand things and follow directions. Another of the tests indicated that the Defendant was not "malingering," or fabricating the symptoms of her mental illness. Dr. Mount's general impression of the Defendant was that she was "fairly stable," "well oriented," "very bright," "very cooperative," "extremely courteous," "very kind," "passive," and "reserved." He also testified that all of his findings were consistent with his diagnosis of the Defendant's mental disorder. He stated that she was not in touch with reality at the time of the accident, and she "did not have an appreciation of the nature and wrongfulness of the offense."

He theorized that the Defendant's breakdown may have been caused by an overreaction to the September 11th tragedy.

Dr. Bill Regan, a psychiatrist, evaluated the Defendant from April 24 through May 9, 2002 pursuant to a court order. The Defendant was referred to him by the district attorney general's office. He determined that the Defendant had a history of bipolar disorder with episodes of mania. He believed that the Defendant's delusions around the time of the wreck -- that J.F.K. was alive and behind 9/11, and that she was pregnant with a "world leader" -- were triggered by the September 11th attacks. Dr. Regan testified that, at the time of the accident, the Defendant was "out of touch with reality." She believed that her car would fly if she pulled back on the steering wheel. She thought it was a "test from God." Furthermore, Dr. Regan testified that she later told the police that she had "supernatural strength," and she laughed about the accident and how fast she was driving. In Dr. Regan's opinion, the Defendant was "unable to appreciate the wrongfulness of her conduct at the time [of the offense]." However, at the time he performed his psychiatric evaluation of the Defendant, he found her not to be committable because she no longer posed a danger to herself or others.

> The Tennessee Supreme Court has stated that
> appellate courts in Tennessee should reverse a jury verdict rejecting the insanity defense only if, considering the evidence in the light most favorable to the prosecution, no reasonable trier of fact could have failed to find that the defendant's insanity at the time of the offense was established by clear and convincing evidence.[1]

State v. Flake, 88 S.W.3d 540, 554 (Tenn. 2002). In determining whether the jury properly rejected the insanity defense, an appellate court must consider all the evidence in the record in the light most favorable to the State, including evidence of the defendant's actions or words at or near the time of the offense, as well as lay and expert testimony. See id.

> The weight and value to be given expert testimony is a question for the jury. Where there is a conflict in the evidence, the trier of fact is not required to accept expert testimony over other evidence and must determine the weight and credibility of each in light of all the facts and circumstances of the case. Questions concerning the credibility of witnesses, the weight and value of the evidence, as well as all factual disputes raised by the evidence, are for the trier of fact; appellate courts do not reweigh the evidence or reevaluate credibility determinations.

Id. (citations omitted). "While a jury may not arbitrarily ignore evidence, a jury is not bound to accept the testimony of experts where the evidence is contested." Id. at 556.

---

[1] This case differs procedurally from Flake in that the trial court in this case granted the Defendant's motion for judgment of acquittal. However, our standard of review remains the same.

Having considered the evidence in this record in accordance with the principles set forth by our legislature and our supreme court, we agree with the trial court that no reasonable juror could have failed to find that the Defendant's insanity was established by clear and convincing evidence. In its order granting the Defendant's motion for judgment of acquittal, the trial court summarized the evidence in this case as follows:

1) Three imminently qualified experts, two psychiatrists and one psychologist, testified unwaveringly that in their opinion the Defendant was at the time of the wreck delusional and suffered from a severe mental disease, bi-polar mixed, and as a result did not appreciate the nature or wrongfulness of her acts.

2) This Court observed the demeanor of the experts, has reviewed the impeccable credentials of said experts and finds their testimony to have been unchallenged and unimpeached.

3) This Court has carefully reviewed the evidence of the Defendant's conduct over the days and hours leading up to the wreck and finds nothing in that conduct which logically could be construed to defeat the Defendant's proof of severe mental disease or defect or support a finding that the Defendant could appreciate the nature or wrongfulness of her acts.

4) This Court has carefully reviewed the Defendant's statement taken at the hospital some nineteen (19) hours after the wreck and concludes that this statement is not sufficient to defeat the Defendant's otherwise clear and convincing proof of insanity. This Court comes to this conclusion for two reasons: (1) this statement clearly evidences continuing delusion, and (2) the statement was taken many hours after the wreck and at a time when the Defendant had been heavily medicated with two doses of Haldol and one dose of Ativan which had resulted in her being "somewhat over sedated and lethargic" and caused her to be kept at the hospital "until her mental status had improved."

5) There is no proof of malingering.

The State argues that there was evidence presented at trial from which the jury could have determined that the Defendant had failed to establish her insanity. First, Kelly Gass of the Winchester Public Safety Department testified that, after investigating the accident scene, it appeared to him that, just before the impact, the Defendant turned the steering wheel to the left and applied her brakes. The State maintains that this physical evidence contradicts the statements made by the Defendant to the police that "in my mind I'm thinking [God] was going to just raise the car or move the car out of the way," "I don't even think I tapped on the brakes," "It's like and I just thought we were going to go over. I . . . maybe I thought we were going to fly," and "I was thinking I would fly." However, the State fails to explain how the fact that, just before impact, the Defendant applied her brakes and turned the steering wheel, which are quite instinctive reactions, evidences her ability to appreciate the nature or wrongfulness of her conduct. Indeed, Dr. Mount specifically testified that

-7-

someone experiencing such a delusion would still be able to drive and would understand that he or she was driving a car. Therefore, the fact that the Defendant was able to apply her brakes and steer her car does not indicate that she was not experiencing a delusion. In short, the physical evidence at the accident scene does not contest or contradict the expert testimony that the Defendant was delusional at the time of the wreck.

The State also asserts that the jury could have found the Defendant to be sane based upon statements she made to police officers in which she took responsibility for the death of Joshua Sons. For example, she told police, "That was strictly my fault. One hundred percent." "Well I take full responsibility for the . . . or the blame for the death of the little boy." "It's my fault. . . . my child and I just haven't . . . there's no need for lawyers or anything . . . I'll do whatever. Whatever it takes monitoring. . . . monetarily or whatever. Jail time I mean whatever."

However, Dr. Mount specifically testified that someone with the Defendant's mental illness would still be capable of feeling guilt and remorse upon learning that she had hurt someone. Furthermore, Dr. Mount testified that the Defendant was still delusional at the time she gave the statement to the police. In his words, "In reviewing the statement, and as a whole, I think this statement is replete with grandiose religiosity and possible delusional material taken in its total context." He also testified that the statement from the Defendant to the police did not change his diagnosis that her mental disease prevented her from understanding the nature and wrongfulness of her conduct. Also, as the trial court noted in its order, the Defendant was heavily medicated at the time she gave her statement to the police. Therefore, the Defendant's statement to police, in which she makes several outrageous and often incoherent claims, does not contradict the conclusion that she was "out of touch with reality" at the time of the accident.

Finally, the State argues that the jury could have found that the Defendant was trying to kill herself. The State points to statements she made at the accident scene that she did not care if her car caught fire and she died and her statement at the hospital that "she wished she could have killed herself." Dr. Mount testified that it was possible that the Defendant did want to kill herself, but she was still in a delusional state that kept her from being able to understand the nature or wrongfulness of her conduct. Therefore, these statements do not conflict with the evidence that the Defendant was legally insane at the time of the wreck.

We are quite aware that, by making insanity an affirmative defense that must be proven with clear and convincing evidence, and by not allowing experts to testify to the ultimate issue of sanity, our legislature has demonstrated its strong preference that the defense of insanity be difficult to successfully maintain. See Tenn. Code Ann. § 39-11-501. Moreover, we recognize that the standard of review that our supreme court set forth in Flake greatly limits the authority of an appellate court to reverse a jury verdict rejecting the insanity defense. See 88 S.W.3d at 554. Indeed, the Court in Flake explicitly stated, "Where the proof is contested, appellate courts should rarely reverse a jury's rejection of the insanity defense under this deferential standard of review." Id. at 556. However, we are also mindful that our supreme court has instructed that "a jury may not arbitrarily ignore evidence." Id. In this case, because the proof of the Defendant's inability to appreciate the nature

or wrongfulness of her conduct was uncontested and there was no conflict in the evidence, we agree with the trial court and conclude that the jury did arbitrarily ignore and disregard the evidence of the Defendant's insanity.

In Flake, the trial court specifically declined to exercise its role as thirteenth juror and enter a judgment of not guilty by reason of insanity, stating, "the defense of insanity was appropriately litigated and I think that the jury appropriately made the proper determination." Id. at 556. Here, in its order granting the judgment of acquittal, the trial court stated: "At trial the insanity defense was established by clear and convincing evidence, and neither the court nor the jury can ignore the law." Based on our review of the record in this case, we are unable to conclude that the trial judge erred by granting the motion for judgment of acquittal.

Therefore, the judgment of the trial court granting the Defendant's motion for judgment of acquittal is affirmed.

_____
DAVID H. WELLES, JUDGE