**Opinion issued February 7, 2013.**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-09-00226-CR

————————————

**CHARLES FRANKIE NIETO, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 114th District Court**
**Smith County, Texas**
**Trial Court Case No. 4-95-95**

---

### MEMORANDUM OPINION ON REHEARING

Appellant Charles Frankie Nieto has filed a motion for rehearing of our opinion issued on October 18, 2012. The State did not file a response to this motion. We grant rehearing, withdraw our opinion of October 18, 2012, issue this opinion in its place, and vacate our judgment of October 18, 2012.

In 1995, a jury found Nieto guilty of the murder of his cousin, Gilbert Nieto, and sentenced him to life imprisonment. Nieto appealed his conviction and asserted three points of error: (1) that the trial court erred in denying his *Batson* challenge to the State's use of its peremptory strikes to exclude five African-American members from the jury panel; (2) that the trial court abused its discretion by admitting evidence that Nieto brought a gun to a bootlegger's house shortly before the charged offense; and (3) that the trial court abused its discretion by admitting evidence that Nieto was in jail shortly before the charged offense. On original submission to this court,[1] we concluded that the trial court erred in denying his *Batson* challenge as it related to one prospective juror, Gregory Maudlin. *See Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712 (1986); *Nieto v. State*, No. 01-09-00226-CR, 2010 WL 5117349, at *6 (Tex. App.—Houston [1st Dist.] Dec. 16, 2010) (mem. op., not designated for publication), *rev'd*, 365 S.W.3d 673 (Tex. Crim. App. 2012). We reversed the conviction and remanded to the trial court without considering Nieto's *Batson* challenges to the four other African-American

---

[1] In 1997, the Twelfth Court of Appeals affirmed Nieto's conviction, but criticized the adequacy of appellate counsel's briefing. *Nieto v. State*, No. 12-95-00204-CR, (Tex. App.—Tyler May 29, 1997, no pet). Nieto then filed an application for a writ of habeas corpus with the Texas Court of Criminal Appeals, alleging ineffective assistance of counsel. The Court of Criminal Appeals remanded the application to the trial court for a hearing and then granted permission for Nieto to appeal his conviction within thirty days of that order. *Ex parte Nieto*, No. AP-76, 090, 2009 WL 256525, at *1 (Tex. Crim. App. Feb. 4, 2009). Although this case was originally appealed to the Twelfth Court of Appeals, it was eventually transferred to this court by the Texas Supreme Court pursuant to its docket equalization efforts.

venire members who were struck by the State. The Texas Court of Criminal Appeals reversed our judgment, concluding that the trial court did not err in denying Nieto's *Batson* challenge to Maudlin. *Nieto v. State*, 365 S.W.3d 673, 681 (Tex. Crim. App. 2012). The Court of Criminal Appeals remanded the case to this Court for consideration of Nieto's remaining issues: (1) whether the trial court clearly erred by finding that the State's reasons for exercising its peremptory strikes against the other four African-American venire members were race-neutral and were not mere pretext for purposeful discrimination; (2) whether the trial court abused its discretion by admitting evidence that Nieto brought a gun to a bootlegger's house shortly before the offense, and (3) whether the trial court abused its discretion by admitting evidence that Nieto was in jail shortly before the offense. Finding no reversible error, we affirm.

## Background

On January 29, 1995, police responded to a 911 call informing them of a shooting. Upon arriving at the scene, the police found broken glass, blood, and a firearm. Officers were able to locate the vehicle involved in the incident at a nearby hospital. The officers found a substantial amount of blood on the driver's side of the vehicle, and the driver's side window was missing.

Dora Moralez was a passenger in the backseat of the car at the time of the shooting and was the person who placed the 911 call. She informed police officers

3

that Nieto, who was a passenger in the car, had shot his cousin Gilbert, who was driving the car just before the shooting. When questioned at the hospital, Nieto told an officer that an unknown person had approached the car and shot Gilbert from the driver's side of the vehicle. Nieto later changed his account and told the officer that the person had shot through the passenger's side window.

Officers arrested Nieto and conducted a videotaped interview of him. During the interview, Nieto admitted shooting Gilbert but claimed it was an accident and that he had intended to point the pistol in front of Gilbert, not at him.

During trial, Moralez testified that before the shooting she, Nieto, and Gilbert drove to a bootlegger's house. Nieto left the car and went to speak with the bootlegger, while Moralez and Gilbert remained in the car. Moralez saw that Nieto had a gun behind his back while he was speaking with the bootlegger. Nieto dropped the gun on the ground, and the bootlegger took a few steps back. Nieto picked up the gun, reentered the car on the passenger's side, placed the gun on his lap, and told Gilbert that he had "dropped the gun."

As they were leaving the bootlegger's house, Gilbert told Nieto to "quit messing around and put the gun up." Nieto told Gilbert to shut up or he would shoot him, to which Gilbert responded, "Well, shoot me." Nieto then told Gilbert to stop the car. After a few minutes, Moralez heard Nieto handling the gun and saw him pull back the slide on the gun to chamber a round. Morlaez saw Nieto

4

place the gun to Gilbert's head and fire. After Nieto fired the shot, Moralez got out of the car and ran to a nearby store to call the police. A pathologist who performed the autopsy on Gilbert also testified and told the jury that the muzzle of the gun was in contact with Gilbert's skin when it was discharged.

Lisa Nieto, Gilbert's sister and Nieto's cousin, also testified at trial. Lisa explained that Nieto had been arrested and put in jail about two weeks before the shooting. According to Lisa, Nieto was mad at Gilbert because Gilbert had not bailed Nieto out of jail. She heard the two argue about it multiple times in the days before the shooting. Lisa said that Nieto was still angry with Gilbert on the day of the shooting.

In his defense, Nieto presented the testimony of his aunt, Nancy Nieto, to rebut the State's evidence of motive. Nancy testified that from the time of Nieto's release from jail until Gilbert's death, she did not observe any animosity between Nieto and Gilbert. She further testified that she never heard Nieto accuse Gilbert of failing to help Nieto get out of jail.

On appeal, Nieto contends that the trial court clearly erred by finding that the State's proffered reasons for exercising its peremptory strikes against four African-American venirepersons were race-neutral and were not mere pretext for purposeful discrimination. He also argues that the trial court abused its discretion

5

by admitting Moralez's testimony that Nieto brought a gun to a bootlegger's house and by admitting Lisa's testimony that Nieto was previously in jail.

## *Batson* Challenges

Sixty people were summoned for jury selection in this case. During the morning session, the trial court conducted its own voir dire of the venire. Because District Attorney Jack Steen, Jr., the State's lead prosecutor, was unable to attend the morning session, David Dobbs, the chief felony prosecutor for Smith County, attended and observed the venire during the morning session. Dobbs did not attend the afternoon session of jury selection, which was conducted by Steen, nor did Dobbs participate in the remainder of the trial.

At the conclusion of the voir dire examination, the trial court granted six strikes for cause, leaving fifty-four eligible venire members. The State exercised five of its ten peremptory strikes against venire members Lewis Thompson, W.T. Hart, Gregory Maudlin[2], Patrick Brooks, and Tommie Taylor, the only five African-Americans within the strike-zone. A twelve-person jury was empaneled, which consisted of eleven white persons and one Hispanic male (Nieto is a Hispanic male). Nieto challenged the use of the State's peremptory strikes under

---

[2]     As noted, the Court of Criminal Appeals has already considered Nieto's *Batson* challenge as it relates to venire member Gregory Maudlin. Therefore, we will review Nieto's arguments as they relate to the State's strikes against the remaining four venire members.

6

*Batson v. Kentucky*, 476 U.S. 79, 109 S. Ct. 1712 (1986), asserting that the State struck the five African-American venire members based on their race.

The trial court evaluated Nieto's *Batson* challenge under the required three-step process. First, the trial court found Nieto had made a prima facie showing of race discrimination based on the number of peremptory strikes the State used to strike minority prospective jurors, the composition of the panel before and after the strikes, and Nieto's race. The trial court then explained that it was the State's burden to present race-neutral reasons for exercising its peremptory strikes as it did. Testifying in narrative form, Skeen explained his rationale for striking each individual. With respect to Thompson, Skeen testified that he struck Thompson because the State's jury card indicated Thompson previously served on a "horrible" felony DWI jury where the defendant had two prior DWI convictions. According to Skeen, Thompson voted to acquit the defendant in that case despite the fact that the State viewed it as a "good" case for the prosecution.

Skeen testified the State used a peremptory strike against Hart based on Hart's criminal history. Hart was prosecuted for and pleaded guilty to a liquor violation in Smith County. According to Skeen, Hart failed to disclose this criminal history when Skeen asked the venire as a whole whether they or anyone in their immediate family had ever been charged or arrested for a criminal offense.

7

Because Hart had a criminal history and failed to disclose it when questioned, Skeen struck him from the jury.

Next, Skeen testified that he used a peremptory strike on Brooks because Dobbs noted that Brooks looked upset and stared at Dobbs when he walked into the courtroom. Additionally, Skeen testified that Brooks has the same first and last name as, and therefore may be related to, a defendant whom Skeen had previously prosecuted for murder. Therefore, Skeen explained that the reasons for striking Brooks were based on Dobbs' notes concerning Brooks' demeanor during voir dire and the potential relationship between Brooks and a murder defendant whom Skeen had prosecuted.

Finally, with regard to Taylor, Skeen testified that she responded during voir dire that she had been convicted of alcohol possession. Skeen testified that he had a criminal history card for Taylor that reflected a conviction for a liquor violation and that this was the basis for his peremptory strike against Taylor.

Nieto cross-examined Skeen about whether Skeen questioned any of the venire members individually about the basis for his concerns, to which Skeen responded he did not. Nieto did not offer any other evidence, but argued to the trial court that Skeen failed to sufficiently question the venire members. The trial court found that the reasons offered by the State were sufficient to show facially race-neutral reasons for the exercise of its peremptory strikes and Nieto failed to

8

prove purposeful discrimination. We now consider Nieto's *Batson* challenges as they relate to venire members Thompson, Hart, Brooks, and Taylor.

## A. Applicable Law

In *Batson v. Kentucky*, the United States Supreme Court held that the Equal Protection Clause prohibits the State from exercising its peremptory strikes based only on the potential juror's race. 476 U.S. at 89, 106 S. Ct. at 1719. When a defendant challenges the State's use of a peremptory strike based on *Batson*, the trial court conducts a three-step process to evaluate the *Batson* claim. *Hernandez v. New York*, 500 U.S. 352, 358, 111 S. Ct. 1859, 1865 (1991). First, the defendant must make a prima facie showing of racial discrimination. *Batson*, 476 U.S. at 95–97, 106 S. Ct. at 1722–23. Once the defendant does so, the burden of production shifts to the State to articulate a race-neutral explanation for the strike. *Id.* at 97–98, 106 S. Ct. at 1723–24. The race-neutral explanation articulated by the State does not have to be "persuasive, or even plausible." *Purkett v. Elem*, 514 U.S. 765, 768, 115 S. Ct. 1769, 1771 (1995). Rather, "the issue is the facial validity of the prosecutor's explanation[, and] [u]nless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Id.* (quoting *Hernandez*, 500 U.S. at 360, 111 S. Ct. at 1866). Finally, the trial court then must determine if the defendant has established purposeful discrimination. *Batson*, 476 U.S. at 98, 106 S. Ct. at 1724. The defendant bears the burden to

9

prove by a preponderance of the evidence that the State's reasons for the peremptory strike are merely a pretext for purposeful racial discrimination. *Thomas v. State*, 209 S.W.3d 268, 270 (Tex. App.—Houston [1st Dist.] 2006, no pet.).

A trial court's ruling on a *Batson* challenge must be sustained unless it is clearly erroneous. *Snyder v. Louisiana*, 552 U.S. 472, 477, 128 S. Ct. 1203, 1207 (2008). In determining whether the State's proffered reason is pretextual, both the trial court and the appellate court must focus on the genuineness of the asserted race-neutral reason instead of its reasonableness. *See Gibson v. State*, 144 S.W.3d 530, 533–34 (Tex. Crim. App. 2004). We defer to the trial court's ruling on the issue of discriminatory intent because these findings largely turn on the trial court's evaluation of the demeanor and credibility of the attorney who exercises the peremptory challenge. *Hernandez*, 500 U.S. at 365, 111 S. Ct. at 1869; *see also Gibson*, 144 S.W.3d at 534 (recognizing that clearly erroneous standard is highly deferential standard because trial court is in best position to determine whether prosecutor's facially race-neutral explanation for peremptory strike is genuinely race-neutral). Finally, in applying the clearly erroneous standard, we review the record, including the voir dire, the racial makeup of the venire, the prosecutor's race-neutral explanations, and the appellant's rebuttal and impeaching evidence. *Vargas v. State*, 838 S.W.2d 552, 554 (Tex. Crim. App. 1992).

**B.    Analysis**

As explained in more detail above, the State offered the following reasons for striking these four venire members: (1) Thompson's prior participation on a "horrible" jury that acquitted a defendant in a felony DWI case despite the State's belief that the prosecution's case was strong; (2) Hart's failure to disclose his prior conviction for a liquor violation when asked during voir dire; (3) Brooks's stare and upset facial expression at Dobbs when Dobbs walked into the courtroom, and the fact that Brooks had the same first and last name as a murder defendant whom Skeen had prosecuted; and (4) Taylor's prior conviction for a liquor violation, which she reported to the court during voir dire.

The Fifth Court of Appeals and the Fourteenth Court of Appeals have held that a bad record during prior jury service is a race-neutral explanation for striking a prospective juror. *See Bausley v. State*, 997 S.W.2d 313, 316 (Tex. App.—Dallas 1999, pet. ref'd); *Webb v. State*, 840 S.W.2d 543, 545–46 (Tex. App.—Dallas 1992, no pet.); *Levy v. State*, 749 S.W.2d 176, 178 (Tex. App.—Houston [14th Dist.] 1988, pet. ref'd).   Additionally, this Court has held that the failure of a prospective juror to fully disclose his criminal history or record is a race-neutral reason for the exercise of a peremptory strike. *See Moore v. State*, 265 S.W.3d 73, 83 (Tex. App.—Houston [1st Dist.] 2008, pet. dism'd); *see also Bolden v. State*, 923 S.W.2d 730, 734 (Tex. App.—Tyler 1996, no pet.) (holding State's reason for

11

exercising peremptory strike based on prospective juror's criminal record was race-neutral); *Alexander v. State*, 919 S.W.2d 756, 765 (Tex. App.—Texarkana 1996, no pet.) (holding that striking prospective juror because his or her friend or family member has criminal history is race-neutral).

Further, in this very case, the Court of Criminal Appeals found that the reasons offered by the State for its use of a peremptory strike against Maudlin— Maudlin's demeanor (glaring) during voir dire coupled with the potential family connection between Maudlin and a known criminal family, several members of which had been prosecuted by the district attorney's office—were race neutral and not pretextual. *See Nieto*, 365 S.W.3d at 679–81; *see also Sterling v. State*, 830 S.W.2d 114, 118–19 (Tex. Crim. App. 1992) (finding no *Batson* violation after considering entire voir dire record, where reasons offered by State for peremptory strike included possibility that potential juror was related to individuals who had been prosecuted by district attorney's office, potential juror himself had been prosecuted by district attorney's office, and potential juror's opposition to death penalty). Finally, the Court of Criminal Appeals has held that the demeanor of a potential juror is a valid reason to exercise a peremptory strike. *See Yarborough v. State*, 947 S.W.2d 892 (Tex. Crim. App. 1997). Therefore, we conclude that the trial court did not clearly err in determining the State had offered facially race-neutral reasons for its peremptory strikes against these four venire members.

Despite these authorities, Nieto contends his *Batson* challenge should succeed based on: (1) the prosecutor's failure to question individually each of these four venire members; and (2) the fact that the State struck 83% of the minority jurors in the strike zone.

The Court of Criminal Appeals has set forth a nonexhaustive list of factors that may be considered to determine whether the State's reasons for a peremptory strike are an impermissible pretext for discrimination: (1) the reason given for the peremptory challenge is not related to the facts of the case; (2) lack of questioning to the challenged juror or a lack of meaningful questions; (3) disparate treatment—persons with the same or similar characteristics as the challenged juror were not struck; (4) disparate examination of members of the venire—questioning a challenged juror so as to evoke a certain response without asking the same question of other panel members; and (5) an explanation based on a group bias where the group trait is not shown to apply to the challenged juror specifically. *Whitsey v. State*, 796 S.W.2d 707, 713–14 (Tex. Crim. App. 1989). However, the Court of Criminal Appeals has also recently explained that the lack-of-individual-questioning factor should not be given dispositive weight because it was only one of several factors articulated in *Whitsey*. *See Grant v. State*, 325 S.W.3d 655, 660–61 (Tex. Crim. App. 2010). The Court in *Grant* stated that "a lack of questioning to flesh out a written response has significantly less persuasive value when

13

prospective jurors are being questioned together," especially under the usual time constraints of voir dire which limit a party "in its ability to ask an individual venire member on whom the party may exercise a strike—let alone all such venire members—about specific" responses. *Id.* at 661.

Here, like in *Grant*, Nieto argues that these venire members should have been questioned further. However, the Court of Criminal Appeals considered, and rejected, this same argument when Nieto raised it in reference to Maudlin. The Court of Criminal Appeals, recognizing that the lack of individual questioning is less significant when jurors are questioned together, as they were in this case, explained that "*Batson* leaves room for the State to exercise peremptory strikes based on a 'hunch' or past experience, as long as racial discrimination is not the motive." *Nieto*, 365 S.W.3d at 679. More importantly, the credibility of the reasons offered by the State must be judged in light of the entire voir dire record and other circumstances. *See id.* (citing *Miller-El v. Dretke*, 545 U.S. 231, 252, 125 S. Ct. 2317, 2331–32 (2005)). The Court of Criminal Appeals, after considering the voir dire record, the statistics, and any evidence of disparate treatment, concluded that the reasons offered for striking Maudlin—potential family connection and demeanor—were racially neutral and were not pretext for discrimination. *Id.* at 679–681. Likewise, we conclude here that lack of questioning alone is not dispositive of the issue of pretext. While it is possible that

14

further questioning by the prosecutor may have helped strengthen his reasons for exercising the strikes, the mere fact that the prosecutor did not pursue further questioning does not render his offered reasons pretextual. *See Vargas*, 838 S.W.2d at 556. Instead, we must consider the entire record of voir dire and the other circumstances surrounding the strikes, including statistics and whether there was any evidence of disparate treatment. *See Nieto*, 365 S.W.3d at 679.

This brings us to Nieto's second contention: pretext is shown by the fact that the State exercised its peremptory strikes to exclude 83% of minorities, and 100% of African-Americans, from the jury. Whether statistics indicate a disproportionate use of peremptory strikes to exclude a minority is one factor that may be considered to determine whether the reasons offered for the strikes are pretextual. *See Miller-El*, 45 U.S. at 241, 125 S. Ct. at 2325. In *Miller-El*, the United States Supreme Court held that the State's use of its peremptory strikes to exclude 91% of eligible African-Americans from the jury constituted disproportionate use of strikes against minorities and, when viewed in light of the other circumstances of the case,[3] demonstrated that the reasons offered for the strikes were mere pretext

---

[3] The Supreme Court also considered the prosecution's shuffling of the venire panel after African-American venire members appeared at the front of the panel, the State's use of contrasting voir dire questions posed to African-American and non-African-American jurors on capital punishment and minimum acceptable sentences, and the use of a manual that encouraged a systematic policy of excluding African-Americans from juries that was used by the district attorney's

15

for racial discrimination. *Id.* at 253, 125 S. Ct. 2335. However, the Supreme Court considered evidence of side-by-side comparisons of African-American panelists who were struck and white panelists who were allowed to serve "[m]ore powerful than these bare statistics." *Id.* at 241, 125 S. Ct. at 2325.

Here, as in *Miller-El*, a large percentage of minorities was struck by the State. However, the record does not reveal disparate treatment of minority and nonminority prospective jurors. Rather, the record demonstrates that although the State struck Hart and Taylor because of their personal criminal records and Brooks because of his potential relation to a murder defendant, the State also struck one white venire member who was convicted of vehicular manslaughter and two other white venire members who had close family members with criminal convictions. There is no evidence in the record that a nonminority venire member had a negative demeanor or had previously served on what the State considered to be a "horrible" jury but was not struck.

Furthermore, as the party making the *Batson* challenge, Nieto had the burden to show that the explanations given by the State for the strikes were merely pretext for purposeful discrimination. *See Johnson v. State*, 68 S.W.3d 644, 649 (Tex. Crim. App. 2002) (failure to offer any rebuttal to proffered race-neutral explanation may be fatal to *Batson* claim). Nieto briefly cross-examined, but only

---

office, as evidence of racial discrimination. *See Miller-El*, 45 U.S. at 253–64, 125 S. Ct. at 2332–40.

to inquire whether Skeen pursued further questioning of any of these prospective jurors or whether others had observed Brooks staring at Dobbs. And Nieto did not present the trial court with any comparisons between unchallenged white venire members and the African-American venire members who were struck. In sum, Nieto failed to put on evidence to rebut the State's proffered race-neutral explanations for its strikes.

After considering the entire voir dire transcript, the racial makeup of the venire, the prosecutor's race-neutral explanations, and the appellant's rebuttal and impeaching evidence, we conclude that the record supports the trial court's ruling and that the trial court did not clearly err in finding that the reasons offered by the State for striking Thompson, Hart, Brooks, and Taylor were race-neutral and not mere pretext for purposeful racial discrimination. Therefore, we overrule Nieto's first point of error.

**Evidentiary Challenges**

**A.    Standard of Review**

We review a trial court's decision to admit evidence for an abuse of discretion. *See Shuffield v. State*, 189 S.W.3d 782, 793 (Tex. Crim. App. 2006); *Wolfberg v. State*, 73 S.W.3d 441, 443 (Tex. App.—Houston [1st Dist.] 2002, pet. ref'd). A trial court abuses its discretion only if its decision is "so clearly wrong as to lie outside the zone within which reasonable people might disagree." *Taylor v.*

17

*State*, 268 S.W.3d 571, 579 (Tex. Crim. App. 2008).  If the trial court's decision is correct on any theory of law applicable to the case, we will uphold the decision. *De La Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009).  "When a trial court further decides not to exclude the evidence, finding that the probative value of the evidence is not outweighed by the danger of unfair prejudice, this decision too shall be given deference." *Moses v. State*, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003).

## B.    Admissibility of Moralez's testimony

In his second point of error, Nieto argues that the trial court abused its discretion in admitting Moralez's testimony that he took a gun to a bootlegger's house shortly before the shooting.  At trial, Nieto objected to the admissibility of the portion of Moralez's testimony in which she recounted Nieto's exchange with the bootlegger.  According to Nieto, this testimony was inadmissible under Texas Rule of Evidence 403 because its probative value was substantially outweighed by its prejudicial effect.  In response, the State argued this evidence was admissible as same transaction contextual evidence.  The State also maintained that this evidence showed Nieto had control of the murder weapon in the time leading up to the shooting.  The trial court concluded that Moralez's testimony was probative on the issue of whether, immediately before the shooting, Nieto had knowledge that the gun was in operating order and possibly may have had a bullet chambered at that

18

time. The trial court overruled Nieto's objection, determining that the probative value of this testimony outweighed any prejudicial effects.

On appeal, Nieto maintains that the evidence was not probative as to the issue of intent or knowledge that the gun was loaded and deadly because Moralez's testimony contains no evidence that Nieto knew the weapon was loaded at the time of his encounter with the bootlegger. In fact, Nieto asserts, the evidence shows that Nieto chambered a round moments before shooting Gilbert, making irrelevant Moralez's testimony about what Nieto did or knew while at the bootlegger's house. Nieto contends that the State had no need to introduce the evidence of the events at the bootlegger's house other than to prejudice the jury. Therefore, according to Nieto, the "prejudicial effect of suggesting to the jury that Appellant was a violent man who associated with bootleggers" substantially outweighed any probative value.

Under Rule 403, relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . ." TEX. R. EVID. 403. In conducting this balancing test, courts should consider the following: (1) the inherent probative force of the proffered evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5)

any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate its probative force, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted. *Gigliobianco v. State*, 210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006).

Whether erroneous admission of evidence constitutes reversible error is governed by Texas Rule of Appellate Procedure 44.2(b), which applies to non-constitutional errors in criminal cases. *See* TEX. R. APP. P. 44.2(b); *Cruz v. State*, 238 S.W.3d 381, 386 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd). The judgment will be reversed only if the error affected an appellant's substantial rights. *See Kibble v. State*, 340 S.W.3d 14, 20 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd). An error affects an appellant's substantial rights "when the error has a substantial and injurious effect or influence in determining the jury's verdict." *Id.* (citing *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997); *James v. State*, 264 S.W.3d 215, 222 (Tex. App.—Houston [1st Dist.] 2008, pet. ref'd). An error that did not influence the jury or had but a slight effect on the jury is not reversible. *McRae v. State*, 152 S.W.3d 739, 744 (Tex. App.—Houston [1st Dist.] 2004, pet. ref'd) (citing *Solomon v. State,* 49 S.W.3d 356, 365 (Tex. Crim. App. 2001)). In making the determination of whether appellant's substantial rights were affected, the factors we consider include the nature of evidence supporting

the verdict, the character of the alleged error, and how it might be considered in connection with other evidence in the case. *Id.* (citing *Bagheri v. State*, 119 S.W.3d 755, 763 (Tex. Crim. App. 2003)). We should also consider whether the State emphasized the error, whether the erroneously admitted evidence was cumulative, and whether it was elicited from an expert. *Id.*

Here, even assuming the trial court erred in admitting evidence of Nieto's encounter with the bootlegger, we nevertheless conclude the error was harmless. The disputed issue at trial concerned whether the shooting was intentional or accidental, and the nature of the evidence supporting the jury's verdict was strong. Moralez, an eyewitness to the shooting, testified that Nieto and Gilbert were arguing when Nieto threatened to shoot Gilbert and told him to stop the car. According to Moralez's testimony, Nieto pulled the slide back on the gun, which chambered a round, placed the gun to Gilbert's head, and fired it. The pathologist's testimony that the gun was in contact with Gilbert's skin when it was fired confirmed Moralez's account of the shooting. This testimony and physical evidence directly contradicts Nieto's inconsistent accounts to police, including his final account in which he claimed that he pointed the gun in front of Gilbert, not at him. The allegedly improperly admitted evidence—that Nieto brought the gun to his encounter with the bootlegger—is insignificant in comparison and, if it influenced the jury at all, would have had but a slight effect. *McRae*, 152 S.W.3d

21

at 744. Although this evidence was not cumulative and was discussed in the State's closing argument, it was elicited from a lay witness, not an expert. *See id.* After examining the record as a whole, we cannot say that the admission of Moralez's testimony, if erroneous, affected Nieto's substantial rights. *See id.* at 744–45 (finding that although evidence of improperly administered field sobriety test was erroneously admitted, that error had little effect on jury's verdict and that appellant's conviction would have been certain without that erroneously admitted evidence in light of abundance of evidence presented by State on issue of appellant's intoxication). Because Nieto's substantial rights were not affected, we conclude that any alleged error in admitting evidence about Nieto's exchange with the bootlegger was harmless and must, therefore, be disregarded. *See id.*; TEX. R. APP. P. 44.2.

We overrule Nieto's second point of error.

## C.     Admissibility of Lisa's testimony

In his third point of error, Nieto argues that the trial court abused its discretion in allowing Lisa to testify that, in the days before the shooting, Nieto was angry with Gilbert for not bailing him out of jail. Nieto objected to this testimony, arguing that this was extraneous-offense evidence and that the State had not given the required notice under Texas Rule of Evidence 404(b) of its intent to use it. Nieto further maintained that this evidence was more prejudicial than

22

probative and, therefore, was inadmissible under Texas Rule of Evidence 403. The trial court allowed the evidence to be admitted, but excluded all evidence relating to the reason Nieto was in jail.

### 1. Rule 404(b)

Nieto contends that Lisa's testimony was evidence of an extraneous offense, and, as such, the State was required under Rule 404(b) to notify Nieto in advance of trial that it planned to introduce the evidence. Because the State only notified Nieto about the evidence on the day of trial, Nieto contends that this evidence was inadmissible under Rule 404(b). In response, the State maintains that the testimony did not constitute evidence of an extraneous offense, and therefore the Rule 404(b) notice requirement does not apply, because Lisa only mentioned the fact that Nieto was in jail without discussing the reason for his imprisonment.

Rule 404(b) allows evidence of "other crimes, wrongs or acts" to be admitted for purposes such as "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident," and if "reasonable notice is given in advance of trial of intent to introduce such evidence." TEX. R. EVID. 404(b). To constitute an extraneous offense, the evidence must show a crime or bad act and the defendant's connection to it. *Nguyen v. State*, 177 S.W.3d 659, 666 (Tex. App.—Houston [1st Dist.] 2005, pet. ref'd). Evidence of an extraneous offense necessarily involves evidence of prior criminal conduct by the defendant.

23

*Id.* "If the evidence fails to show that an offense was committed or that the accused was connected to the offense, then evidence of an extraneous offense is not established." *Id.* at 667 (citing *McKay v. State*, 707 S.W.2d 23, 32 (Tex. Crim. App. 1985)).

Under Rule 404(b), the admissibility of extraneous-offense evidence is conditioned on the State's compliance with the notice provision of Rule 404(b). *Hernandez v. State*, 176 S.W.3d 821, 824 (Tex. Crim. App. 2005). Because this notice requirement is a rule of evidence admissibility, "it is error to admit Rule 404(b) evidence when the State has not complied with the notice provision of Rule 404(b)." *Id.* However, because the notice requirement does not relate to substantive admissibility of evidence, "[t]he lack of notice does not render the evidence inherently unreliable, but instead raises a question about the effect of procedural noncompliance." *Roethel v. State*, 80 S.W.3d 276, 282 (Tex. App.—Austin 2002, no pet.) Such an error is not reversible unless the erroneous admission of evidence "had a substantial and injurious effect or influence in determining the jury's verdict." *King*, 953 S.W.2d at 271; *see also* TEX. R. APP. P. 44.2(b) ("Any other error, defect, irregularity, or variance that does not affect substantial rights must be disregarded.").

The purpose of the Rule 404(b) notice provision is to prevent surprise and to allow the defendant to prepare a defense. *See Hayden v. State*, 66 S.W.3d 269, 272

24

(Tex. Crim. App. 2001) (purpose of Rule 404(b) notice requirement is to prevent surprise); *see also Castle v. State*, No. 03-09-00241-CR, 2010 WL 3370057, at * 3 (Tex. App.—Austin Aug. 25, 2010, no pet.) (mem. op., not designated for publication) (purpose of Rule 404(b) notice provision is to enable the defendant to prepare to meet the evidence of extraneous offenses). As explained by the Texas Court of Criminal Appeals, "[w]hen an appellate court determines that a jury's verdict was substantially influenced by the improper admission of *substantively inadmissible* Rule 404(b) evidence, that influence on the jury's verdict will always be 'injurious' since there was no proper purpose for the jury to consider the evidence." *Hernandez*, 176 S.W.3d at 825 (emphasis added). However, when otherwise *substantively admissible* Rule 404(b) evidence is improperly admitted due to the State's lack of compliance with Rule 404(b)'s notice requirements, "the error in admitting this evidence may have had a substantial effect or influence on the jury's verdict, but it cannot be said that this effect or influence was 'injurious' if the defendant was not surprised by the evidence." *Id.* Stated differently, we must "consider in our harm analysis whether the lack of notice surprised the defendant or adversely affected his trial strategy." *Castle*, 2010 WL 3370057, at *3 (citing *Hernandez*, 176 S.W.3d at 825–26); *see also Guillory v. State*, No. 13-10-00545-CR, 2011 WL 4996465, at *5 (Tex. App.—Corpus Christi Oct. 20, 2011, pet. ref'd) (mem. op., not designated for publication) ("[T]o show harm

25

flowing from the lack of notice, an appellant must show both that he was surprised and show how his defense strategy would have been different.").

Assuming that Lisa's testimony concerning Nieto's prior incarceration was extraneous-offense evidence; that the State failed to give Nieto proper notice under Rule 404(b); and that the trial court therefore erred in admitting this testimony, we conclude that any alleged error did not affect Nieto's substantial rights. It is clear that, if not for the State's alleged failure to comply with the notice requirement, this evidence would have been admissible under Rule 404(b) to show Nieto's motive for shooting Gilbert.[4] Because this evidence would have been admissible but for the State's alleged violation of the notice requirement, we cannot find that any effect or influence that this testimony had on the jury's verdict was injurious *unless* Nieto was surprised by the evidence or the lack of notice adversely affected his trial strategy. *See Hernandez*, 176 S.W.3d at 825–26.

The record reflects that defense counsel informed the trial court that he was surprised by this testimony and that he was not given sufficient time to prepare for its admission. He then requested a continuance to obtain witnesses, such as Nieto's aunt, Nancy Nieto, and uncle, Larry Castanay, who were with both Nieto and Gilbert in the days before and the day of the shooting, to rebut Lisa's

---

[4]     Nieto does not challenge the substantive admissibility of this evidence under Rule 404(b). His only contention is that the trial court erroneously admitted this evidence because the State failed to provide the requisite notice under Rule 404(b).

testimony regarding Nieto's motive for shooting Gilbert. Rather than grant a continuance, the trial court, noting the extraordinary circumstances, excluded Nancy, who had been sitting in the courtroom throughout the trial, from the application of the Rule. The trial court then permitted defense counsel to question Nancy during a recess and to call Nieto's uncle at his workplace to determine whether his testimony would be helpful and necessary.

After returning from the recess, defense counsel informed the court that he had enough time to speak with Nancy and felt that her testimony would "cover the whole area that her husband's would have and perhaps more." He then decided to proceed to introduce Nancy as a defense witness. Nancy testified that she saw Nieto and Gilbert together on a regular basis and that Nieto and Gilbert were staying at her house the weekend of the shooting. Nancy testified that from the time of Nieto's release from jail until Gilbert's death, she did not observe any animosity between Nieto and Gilbert. She further testified that she never heard Nieto accuse Gilbert of failing to help Nieto get out of jail.

Although Nieto initially may have been surprised by the introduction of Lisa's testimony, he has not shown how his defense strategy might have been different had the State timely notified him of its intent to offer Lisa's testimony at trial, or how his defense was "injuriously" affected by the State's failure to provide reasonable notice. Nieto was given the opportunity by the trial court to speak to

27

potential rebuttal witnesses, the exact witnesses he requested, and eventually called Nancy, whose testimony rebutted the State's evidence of motive. Given that Nieto was given the opportunity to—and did—develop evidence to rebut Lisa's testimony, we conclude that the alleged failure of the State to provide reasonable notice of the extraneous offense did not affect Nieto's substantial rights. *See Hernandez*, 176 S.W.3d at 825–26.

### 2. Rule 403

Nieto further asserts that Lisa's testimony that he was in jail was inadmissible under Rule 403 because its prejudicial effects substantially outweighed its probative value. According to Nieto, the evidence that he had been in jail "encouraged the jury to decide the case on the improper basis that he was a criminal." Nieto also argues that the State had little need for this evidence because of the eyewitness evidence of the dispute between Nieto and Gilbert and the shooting itself.

Under the first two factors of Rule 403 balancing test, we examine the probative value of the evidence and the State's need for the evidence. *Gigliobianco*, 210 S.W.3d at 641. The testimony had probative value because it demonstrated Nieto's possible motive for shooting Gilbert. Furthermore, the State had great need for this evidence. Nieto's principal argument was that the shooting

28

was a mistake and this was the only evidence that showed Nieto's motive for killing Gilbert. These factors weigh strongly in favor of admissibility. *Id.*

For the third factor, we examine the tendency of the evidence to suggest decision on an improper basis. Evidence might have this tendency if it arouses the jury's hostility or sympathy for one side without regard to the probative force of the evidence. *Gigliobianco*, 210 S.W.3d at 641. This evidence could have aroused the jury's hostility for Nieto because it implied he committed some other offense. This factor weighs against admissibility.

For the fourth factor, we examine the tendency of the evidence to confuse or distract the jury from the main issue. "Evidence that consumes an inordinate amount of time to present or answer, for example, might tend to confuse or distract the jury from the main issues." *Casey v. State*, 215 S.W.3d 870, 880 (Tex. Crim. App. 2007). Here, Lisa's testimony about motive was brief and directly relevant to Nieto's motive and the intent element of the charged offense. As such, it has less potential to distract the jury from the charged offense. *See Manning v. State*, 114 S.W.3d 922, 928 (Tex. Crim. App. 2003) (holding that evidence of cocaine in defendant's blood could not distract jury from indicted offense of manslaughter because it was "proof of the indicted offense"). This factor weighs in favor of admissibility.

Under the fifth factor, we weigh any tendency of the evidence to be given undue weight by a jury that has not been properly equipped to evaluate the probative force of the evidence. Here, the evidence was presented as proof of Nieto's motive for shooting Gilbert. And, the evidence was not of a technical or scientific nature; rather, it concerned a matter "comprehensible by laypeople." *Gaytan v. State*, 331 S.W.3d 218, 228 (Tex. App.—Austin 2011, pet. ref'd). The trial court excluded evidence of the reason Nieto was in jail—a stabbing—and thus mitigated any potential for the jury to give undue weight to the evidence. The trial court also equipped the jury to evaluate the probative force of this testimony. It instructed the jury not to consider any testimony regarding the defendant's having committed offenses other than the charged offense for any purpose other than to determine intent, knowledge, absence of mistake, or accident in connection with the charged offense. This factor weighs in favor of admissibility.

Finally, under the sixth factor we consider the time required to develop the evidence. As mentioned, this portion of Lisa's testimony at issue was brief. Thus, its presentation did not "consume an inordinate amount of time." *Gigliobianco*, 210 S.W.3d at 641–42. This factor weighs in favor of admissibility.

Balancing all of the factors, we conclude that the trial court did not abuse its discretion in determining the testimony was not substantially more prejudicial than probative under Rule 403.

30

We overrule Neito's third point of error.

## Conclusion

We affirm the trial court's judgment.


Rebeca Huddle
Justice

Panel consists of Chief Justice Radack, and Justices Bland and Huddle.

Do not publish. TEX. R. APP. P. 47.2(b).

31