IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs March 3, 2015

**STATE OF TENNESSEE V. KENON PACK and JENNIFER BANKS**

**Appeal from the Criminal Court for Shelby County**
**No. 11-04834     Chris Craft, Judge**

_____

**No. W2014-00518-CCA-R3-CD  -  Filed May 26, 2015**

_____

The Defendants, Kenon Pack and Jennifer Banks, were both indicted by the Shelby County Grand Jury for two counts of aggravated child abuse for injuries inflicted upon Defendant Banks's five-year-old daughter.  After a jury trial, both Defendants were convicted as charged, and the trial court merged the two sets of convictions into a single count of aggravated child abuse for each Defendant.  On appeal, both Defendants challenge the sufficiency of the convicting evidence as well as the trial court's rulings regarding the admission and exclusion of certain evidence.  Upon thorough review of the record, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the Court, in which ROBERT W. WEDEMEYER and ROBERT H. MONTGOMERY, JR., JJ., joined.

Claiborne H. Ferguson, Memphis, Tennessee, for the appellant, Kenon Pack.

Stephen Bush, Chief Public Defender; Barry W. Kuhn (on appeal) and Trent Hall (at trial), Assistant Public Defenders, Memphis, Tennessee, for the appellant, Jennifer Banks.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Senior Counsel; Amy P. Weirich, District Attorney General; Eric Christensen and Lora Fowler, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

*Factual and Procedural Background*

This is a direct appeal by both Defendants from their separate convictions in the Criminal Court of Shelby County. Defendant Banks and her boyfriend, Defendant Pack, were both indicted by the Shelby County Grand Jury for two counts of aggravated child abuse, charging in alternative counts that Defendants inflicted serious bodily injury in Count One and used a deadly weapon or dangerous instrumentality in Count Two. The victim was Defendant Banks's five-year-old daughter.[1] According to the State, the victim had been whipped repeatedly with a homemade wooden paddle, sustaining life-threatening injuries.

On Monday, December 13, 2010, the victim's kindergarten teacher, Tiffany Eason, noticed that the victim was unable to sit while eating her breakfast in the school cafeteria. The victim said that her leg was hurting. The victim was a new student and had only been attending Alcy Elementary for a few days. Ms. Eason recalled that the previous Friday, after the Christmas party, she had noticed that the victim was walking strangely and that the victim had said that her leg was hurting on that occasion as well.

The school nurse, Joann Oliver, was called into the cafeteria. Ms. Oliver also noticed that the victim was sitting on her knees while trying to eat breakfast. Ms. Oliver attempted to assist the victim, but when her leg brushed against the victim's buttocks, the victim screamed. Ms. Oliver carried the victim to the teacher's lounge, accompanied by Ms. Eason. The victim was crying. When Ms. Oliver attempted to calm the victim by telling her that they would call her mom, the victim became hysterical, crying, "No, no, no, I don't want to go home."

Once in the teacher's lounge, Ms. Oliver pulled down the victim's pants. The victim's legs and buttocks were swollen, and there were open sores and blood on the backs of her legs, bruises on her thighs, and old scabs and scars on her knees. According to Ms. Oliver, the victim's "whole posterior was just swollen purple black tight red." The principal, Sunya Payne, was notified that there was an emergency and told to come to the teacher's lounge. Ms. Eason asked the victim what happened, and the victim initially said that she fell out of bed. The victim eventually reported that she got a "whooping" from her mom for lying. The victim told Ms. Eason that her mom, Defendant Banks, "whooped" her one time, and that her "daddy," Defendant Pack, "whooped" her more than her mom. The victim reported that she was spanked every day.

Ms. Oliver tried to pull off the victim's panties, and some skin that had adhered to the panties came off. The wounds were fresh, weeping bright red blood. The victim's skin was hot to the touch, swollen, and very tight. Ms. Oliver put an ice pack on the victim's back. The victim became very quiet, started falling asleep, and her breathing was shallow. The victim was going into shock by the time the ambulance arrived to take

---

[1] To protect the identity of the minor victim, we have chosen to refer to her as "the victim" throughout this opinion.

her to the hospital, and she was deteriorating rapidly. Ms. Oliver believed that the victim's condition was life threatening, that "she was dying right in front of us."

Defendants Banks and Pack arrived at the school to pick up the victim. Defendant Banks was not allowed into the teacher's lounge to see the victim. Ms. Payne spoke to Defendant Banks and told her that the child had been beaten and had bruises. Defendant Banks responded that the victim did not say anything to her. Ms. Payne described Defendant Banks as calm but confused, as if she did not know what they were talking about. Defendant Banks kept saying that the victim did not tell her she was hurting. According to Ms. Eason, it was not difficult to see the injuries and anyone living with the victim would have noticed them while bathing or dressing the victim or even seeing her walk.

Paramedic Jeffrey Mayer responded to Alcy Elementary School on December 13, 2010, at approximately 8:15 a.m. He went to the teacher's lounge where he saw the victim lying on the couch, covered with a blanket. He asked the victim to point on a stuffed animal where she was hurting, and the victim indicated from the stomach down both legs. The victim said that her mama gave her a "whooping" with a ruler. Paramedic Mayer cleared non-essential people from the room and removed the blanket to assess the victim's injuries. He noticed her thighs were enlarged and the skin was tight and felt hot to the touch. He explained that this could be due to either internal hemorrhaging or infection. He took the victim's pulse and her heart rate was high, which could be due to loss of blood or pain. Paramedic Mayer documented fourteen areas of injuries on the victim, characterizing her injuries as "significant." When asked what happened, the victim said "my mama gave me a whooping." The victim said that her mother used a ruler and that she got a "whooping" every day when she came home from school.

Both Ms. Payne and Ms. Eason accompanied the victim to the hospital. The victim told Ms. Payne that her mommy gave her "one tap tap," and that her daddy gave her "more than one tap tap." Ms. Payne understood the victim to be referring to Defendant Pack when she talked about her "daddy." Ms. Eason recognized Defendant Pack as the person who brought the victim to school every day. The victim said she got spanked if she did not finish her math problems or if she lied. The victim said that she was hit with a ruler or a big stick. The victim also said that sometimes she holds crates when she gets in trouble.

Dr. Karen Lakin, a board certified physician in pediatrics and child abuse pediatrics, examined the victim at LeBonheur Children's Hospital. She spoke to the victim, the school personnel who accompanied the victim to the hospital, and the victim's mother, Defendant Banks. The victim reported that she had been whipped. Defendant Banks reported that the victim was whipped the prior Saturday. Dr. Lakin explained that, during the examination, the victim was very still rather than moving around like children usually do. The victim would react in pain when the areas that were bruised or swollen

were touched, but otherwise remained very lethargic. Dr. Lakin stated that the victim "was basically in shock."

Dr. Lakin noticed that there was significant swelling to both lower extremities, with the left side more swollen than the right. The swelling was so dramatic that the victim had lost the contour between her thighs and her buttocks. The victim's skin was very hard and tight, and there was discoloration on the back, the back of the legs, and the buttocks. The victim had a large hematoma, or a collection of blood, in her abdomen. The victim had extremely low blood pressure, low blood volume, and a high heart rate because she had lost about two-thirds of her blood volume from all the bruising in her lower extremities. The victim required an emergency blood transfusion. At trial, Dr. Lakin testified that the victim would have died if she had gone home that day rather than to the hospital.

The victim developed complications from her injuries, including acute kidney damage and necrosis of the tissue on her left thigh. Dr. Lakin performed a debridement, or removal of all of the dead tissue from the wound, like she would if she were treating a severe burn. The victim had to come back to the hospital several times a week over the course of a month to have the bandaging over the wound changed until it was healed enough that the victim could receive a skin graft, where skin from the front of the victim's thigh was shaved off and used to cover the open wound on the back. This wound took three months from the time of the initial injury to heal and developed keloid scars that the victim will have for the rest of her life.

At trial, Dr. Lakin opined that these wounds were the result of blunt force trauma. She said that it would be very painful to put on clothing and that the victim could not bend because of the swelling. She explained that there was evidence of newer injuries on top of older injuries. She said that there would be significant pain to be repeatedly hit on top of old bruises, describing it as "ongoing torture."

During cross-examination by Defendant Pack's attorney, Dr. Lakin said that the victim reported that her mother had whipped her and caused the injuries. After a jury-out hearing, Dr. Lakin read from a page in the victim's medical record over an objection by Defendant Banks. Identified as Exhibit 36A, the page contained an assessment by a Child Life Specialist, including reported medical and social history as well as the Specialist's observations of and interactions with the victim. A follow-up note indicated that the victim, "[a]fter hearing mention of her mother . . . asked EDT[2] if her mother 'knew where she was', 'knew that she had told everyone' and if mother was mad at her or if she was in trouble," and that the Specialist reassured the victim that she was not in trouble for telling her teacher what happened to her, that nobody was mad at her, and that her mother knew where she was and wanted her to heal. Another page from the victim's

---

[2] Dr. Lakin explained that this acronym stood for Emergency Department Technician.

medical records, identified as Exhibit 36B—containing the victim's statement, "My mommy spanked me . . . with a ruler," as well as the victim's disclosures to the school personnel "that her mother [had] 'whipped' her with a 'ruler, belt, and/or paddle'"—was ruled inadmissible by the trial court.

The victim, who was eight years old at the time of trial, testified that she, her two-year-old sister, and her mother, Defendant Banks, moved in with Defendant Pack in October of 2010. She said that Defendant Pack whipped her almost every day whenever she "told stories" or had an accident in her pants. Defendant Pack would make her lay on a bench in his workout room wearing nothing but her panties, and he would whip her with one of two homemade paddles made out of a large wooden ruler and a belt wrapped in black tape. She described being hit with something hard, not like a belt, and that it "hurted." She testified that her mother, Defendant Banks, never whipped her before moving into Defendant Pack's house. After moving in, Defendant Banks only spanked her one time with a comb, not with the homemade paddles.

The victim testified that sometimes Defendant Pack would make her stand in a corner holding a crate of books. When she asked him if she could go to the bathroom, he told her to go back to holding the books. When the victim then urinated on herself, she would get whipped with the paddle.

With regard to the incident that sent her to the hospital, the victim told the jury that Defendant Pack whipped her that morning for lying about putting on deodorant. She said that she cried and screamed while she was getting hit with the paddle. She defecated in her panties, which made Defendant Pack mad. Her mother was present in the house while Defendant Pack whipped her several times over the course of that weekend. The victim said that it hurt when Defendant Banks gave her a bath and got her dressed for school. She identified for the jury the paddles used to beat her as well as pictures of the scars on her legs.

During cross-examination, the victim admitted that she told people at school that her mother had spanked her that morning, but she said that she did so because she was scared to death of Defendant Pack. The victim, who was currently living with her paternal grandmother, admitted that she wanted to go back to living with her mom.

Officer Igor Buzdugan of the Memphis Police Department responded to Alcy Elementary on Monday, December 13, 2010, for a possible child abuse call. He then proceeded to LeBonheur Children's Hospital where he spoke to Defendant Banks. Defendant Banks told Officer Buzdugan that the last time she spanked the victim was in October. She said the victim was last spanked on Sunday, but that she was fine Monday morning when she went to school. She said that the victim would be disciplined for not paying attention, not listening, not eating, and urinating on herself. Officer Buzdugan then spoke to Defendant Pack. Defendant Pack said that he whipped the victim on

Thursday after school and again on Saturday. He said that he used a leather belt and a wooden paddle. He said that he spanked the victim for urinating on herself and not paying attention.

Samuel Cooper, an investigator with the Department of Children's Services ("DCS"), spoke to the victim and both Defendants at the hospital. The victim said that Defendant Pack spanked her that morning before school because she lied about putting on deodorant. Investigator Cooper asked Defendant Banks if she was aware why the victim was at the hospital, and Defendant Banks said it was probably from a spanking that morning before school. Defendant Banks said that the victim had been out of school for two or three months because she did not have stable housing. Investigator Cooper testified that Defendant Banks was not emotional until she was told that the victim could not go home with her. Defendant Banks kept saying that she did not think the injuries were that bad before the victim went to school.

Investigator Cooper then spoke to Defendant Pack, who said that he gave the victim a spanking that morning with two homemade wooden paddles. He said that he whipped the victim for lying to him, because she said that she put on deodorant when she had not. He described the paddles to Investigator Cooper: one was a ruler with tape on it, and the other was a wooden paddle with tape on it. He admitted that he made the paddles to discipline the victim. Defendant Pack admitted to Investigator Cooper that he whips the victim every other day if she does something wrong or lies to him. During cross-examination by Defendant Pack's attorney, Investigator Cooper admitted that he took notes about this conversation on a manila envelope, which he discarded after entering the notes into the computer system. Investigator Cooper also admitted that he entered his notes into the computer system 36 days after the incident, which is longer than the DCS policy of 30 days.

Sergeant Carl Ray of the Memphis Police Department was working as an investigator in the sex crime and juvenile abuse squad in December of 2010. He was called out to LeBonheur Hospital to investigate the injuries to the victim. Sergeant Ray detained both Defendants and brought them to his office at the Child Advocacy Center for an interview. Both Defendants were advised of their rights and signed a waiver of rights form. Sergeant Ray interviewed the Defendants separately.

Defendant Banks told Sergeant Ray that she got a call that morning from the school that her daughter had been sent to the office because her legs were hurting. She stated, "This morning when I got her dressed she was fine. I asked her was she fine and she said yes. After I got her dressed, I sent her to school. I noticed the swelling and it wasn't bad. I didn't think it was this bad." Defendant Banks stated that the victim was disciplined with a white leather belt and a wooden ruler as well as time out. Defendant Banks said that the last time she "really whooped [the victim] to get her attention" was when victim attended another school and had received low marks in conduct during the

week. After a conference with the teacher about the victim's conduct, Defendant Banks told the victim while fixing her a sandwich, "I got to whoop you—whoop your butt this time," and struck her about six times on the bottom. Defendant Banks admitted that the victim received her injuries from discipline, but denied disciplining her "in that way" and denied whipping the victim with a paddle or out of anger. Defendant Banks kept insisting that the victim was fine that morning and swore that if the victim had said she was hurting, she would have sought medical attention rather than sending her to school.

Defendant Pack told Sergeant Ray that that victim was like his daughter even though she was not his biological daughter. The victim, her sister, and Defendant Banks had lived with him for approximately four months. He dropped the victim off at school that morning. He said that he was not sure why she was in the hospital and that he did not notice bruises or lacerations on the victim. When asked about discipline, Defendant Pack said, "I don't think [the victim] should be whipped all the time so I'll make her stand in the corner and make her hold a couple of books while she is standing in the corner. If she does something and repeats it, I'll make her stand there like a time out thing." Defendant Pack admitted whipping the victim with a belt or a paddle before this incident. He stated that the last time he whipped her was the previous Saturday; he hit her six times with a wooden paddle "because she got this thing when she stands in the corner she pees on the floor." He stated that the victim wears panties and an undershirt when he whips her. He denied putting any bruises or lacerations on the victim when he whipped her and stated that he did not use a lot of force.

Sergeant Ray obtained a search warrant and searched Defendant Pack's house with Officer Eric Carlisle. They found one paddle under a treadmill in a bedroom that was being used as a workout room. It was made with two thin boards taped together with a belt as a handle. A second paddle was found stuck in a trashcan outside. It was made out of a ruler and a piece of wood taped together with a nylon strap. Also in the trash can was a plastic shopping bag containing a pair of soiled pink panties along with other trash. The bag was next to the paddle at the top of the fairly full trash can.

Neither Defendant testified. Defendant Pack attempted to call Defendant Banks's mother, Stephanie Banks, as a witness, but Defendant Banks objected. During a jury-out hearing, Ms. Banks initially testified that she did not recall telling the police that she had seen marks on the victim's back before Defendant Banks moved in with Defendant Pack, but instead believed that they were birthmarks. When presented with her statement, Ms. Banks remembered being interviewed by the police during the investigation. In her statement, Ms. Banks told the police that she saw some marks on the victim's back in July that looked like the victim had been hit with a switch. Ms. Banks asked the victim about it and the victim said that her mother had whipped her. Ms. Banks confronted her daughter, and Defendant Banks told her that she had hit the victim with her hand. Ms. Banks recalled telling the police that Defendant Banks also said she used a belt. Ms. Banks admitted that at the time she made the statement, she was angry with her daughter,

Defendant Banks, for preventing her from seeing her grandchildren. She did not know that Defendant Banks was living with Defendant Pack until after this incident.

The trial court determined that Ms. Banks's testimony was not credible and found that the proof relating to the prior bad act was not clear and convincing. The trial court ruled that this testimony was inadmissible propensity evidence and that it was not evidence of a signature crime that would be admissible to prove the identity of the perpetrator. Additionally, the trial court found that any probative value of the evidence was outweighed by the danger of unfair prejudice. The court noted that the testimony about the belt contradicted the victim's testimony that Defendant Banks had only spanked her with a comb, but held that it was only minor impeachment evidence and that the victim had already been impeached by the statement in her medical records where she said Defendant Banks had used a ruler. The court ruled that Defendant Pack could call Ms. Banks as an impeachment witness, but that she could not testify as to any prior bad acts of Defendant Banks. Defendant Pack did not call Ms. Banks to testify in front of the jury.

The jury convicted both Defendants of two counts of aggravated child abuse as charged, and the trial court merged the two sets of convictions. After a sentencing hearing, the trial court sentenced Defendant Banks to 17 years' incarceration and Defendant Pack to 20 years' incarceration. Both Defendants filed timely motions for new trial, and the trial court denied both motions. Both Defendants filed timely notices of appeal.

*Analysis*

On appeal, both Defendants challenge the sufficiency of the convicting evidence. In addition, Defendant Pack alleges that the trial court erred by excluding the testimony of Ms. Banks indicating prior physical abuse of the victim by Defendant Banks. Defendant Pack also argues that the trial court erred by excluding Exhibit 36B, the portion of the victim's medical records containing the victim's disclosures to school personnel, while Defendant Banks argues that the trial court erred by admitting Exhibit 36A, the portion of the victim's medical records containing the victim's statements to the Child Life Specialist. We will address each issue in turn.

*I. Sufficiency of the Evidence*

When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The jury's verdict replaces the presumption of innocence with one of guilt; therefore, the burden is shifted onto the defendant to show that the evidence introduced at trial was insufficient to support such a verdict. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002). The prosecution is entitled to

the "strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom." *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). It is not the role of this Court to reweigh or reevaluate the evidence, nor to substitute our own inferences for those drawn from the evidence by the trier of fact. *Reid*, 91 S.W.3d at 277. Questions concerning the "credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact." *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008)). "A guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." *Reid*, 91 S.W.3d at 277 (quoting *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997)). The standard of review is the same whether the conviction is based upon direct evidence, circumstantial evidence, or a combination of the two. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009).

Both Defendants were indicted for violating Tennessee Code Annotated section 39-15-402, also known as Haley's Law, which defines aggravated child abuse and aggravated child neglect or endangerment. As charged in this case, it is an offense to knowingly, other than by accidental means, treat a child in such a manner as to inflict injury, *see* T.C.A. § 39-15-401(a), and either the victim suffered serious bodily injury—as charged in Count One in this case—or a deadly weapon, dangerous instrumentality, or controlled substance was used to accomplish the act of abuse, neglect, or endangerment—as charged in Count 2. T.C.A. § 39-15-402(a)(1), (2). If the child is eight years of age or less, the offense is punishable as a Class A felony. T.C.A. § 39-15-402(b).

Neither Defendant in this case contests that the victim suffered serious bodily injury or that the wooden paddles used to inflict the injuries constitute dangerous instrumentalities. Both contend only that there was not sufficient proof of the identity of the perpetrator; each Defendant points the finger of guilt at the other as the person responsible for inflicting the injuries on the victim. The State argues that there was sufficient proof from which a jury could infer that both Defendants were directly and criminally responsible for the victim's injuries. We agree with the State.

"The identity of the perpetrator is an essential element of any crime." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (citing *State v. Thompson*, 519 S.W.2d 789, 793 (Tenn. 1975)). The State has the burden of proving the identity of the defendant as the perpetrator beyond a reasonable doubt. *State v. Cribbs*, 967 S.W.2d 773, 779 (Tenn. 1998). The identification of the defendant as the perpetrator is a question of fact for the jury after considering all the relevant proof. *State v. Strickland*, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993) (citing *State v. Crawford*, 635 S.W.2d 704, 705 (Tenn. Crim. App. 1982)). "[T]he testimony of a victim, by itself, is sufficient to support a

conviction." *Id.* (citing *State v. Williams*, 623 S.W.2d 118, 120 (Tenn. Crim. App. 1981)).

In addition to being the primary perpetrator of a crime, a defendant may be convicted of an offense under a theory of criminal responsibility. "A person is criminally responsible as a party to an offense, if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." T.C.A. § 39-11-401(a). "Criminal responsibility is not a separate crime, but 'a theory by which the State may prove the defendant's guilt of the alleged offense . . . based upon the conduct of another person.'" *State v. Dickson*, 413 S.W.3d 735, 744 (Tenn. 2013) (quoting *State v. Lemacks*, 996 S.W.2d 166, 170 (Tenn. 1999)). There is no requirement that the State "elect between prosecution as a principal actor and prosecution for criminal responsibility." *State v. Hodges*, 7 S.W.3d 609, 625 (Tenn. Crim. App. 1998) (citing *State v. Williams*, 920 S.W.2d 247, 257-58 (Tenn. Crim. App. 1995)). A person is criminally responsible for the conduct of another if, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids or attempts to aid another person to commit the offense." T.C.A. § 39-11-402(2). While mere presence during the commission of a crime is insufficient to support a conviction, the defendant need not have taken physical part in the crime to be held criminally responsible; "encouragement of the principal is sufficient." *See State v. Sherman*, 266 S.W.3d 395, 408 (Tenn. 2008) (citations omitted); *State v. Calvin Jones*, No. W2013-00881-CCA-R3-CD, 2014 WL 3778511, at *13 (Tenn. Crim. App. July 31, 2014).

At trial, the victim identified Defendant Pack as the person who whipped her on Monday, December 13, 2010, because she lied to him about putting on deodorant. Defendant Pack points to the victim's prior inconsistent statements that her mother, Defendant Banks, inflicted the injuries. However, the victim explained that she initially blamed the injuries on her mother because she was scared of Defendant Pack. By its guilty verdict, we presume that the jury "accredit[ed] the testimony of the witnesses for the State and resolve[d] all conflicts in favor of the prosecution's theory." *Reid*, 91 S.W.3d at 277. The jury need not specify whether it found each Defendant guilty as the primary perpetrator of the crime or under a theory of criminal responsibility. *Lemacks*, 996 S.W.2d at 171 (holding that where only one offense is at issue, the jury's consideration of criminal responsibility along with a theory of direct liability did not violate the right of jury unanimity).

If the jury accredited the victim's trial testimony that Defendant Pack spanked her that morning, then Defendant Pack is directly responsible for aggravated child abuse. If, on the other hand, the jury accredited the victim's initial disclosures to the school personnel that her mother spanked her, then Defendant Pack is criminally responsible for aggravated child abuse. Defendant Pack admitted to Sergeant Ray that he had whipped the victim on prior occasions and that he whipped the victim the previous Saturday.

Defendant Pack admitted to Officer Buzdugan that he whipped the victim on Thursday and Saturday with a leather belt and a wooden paddle. Defendant Pack admitted to Investigator Cooper that he whipped the victim that morning and that he whipped the victim every other day for lying to him. Significantly, Defendant Pack admitted to Investigator Cooper that he made the wooden paddles found at his residence specifically for the purpose of disciplining the victim. From these admissions, a rational jury could conclude that Defendant Pack inflicted the injuries on the victim himself or, at the very least, that he intentionally assisted the commission of the offense by providing the dangerous instrumentalities used to commit the abuse. *See Hodges*, 7 S.W.3d at 614 (finding evidence sufficient under a theory of either direct or criminal responsibility when the evidence proved that either the mother or the defendant inflicted the fatal injuries on the child even if the State could not show which one actually administered the blows).

Likewise, if the jury accredited the victim's initial disclosures to the school personnel that her mother spanked her, then Defendant Banks is directly responsible for aggravated child abuse. If, on the other hand, the jury accredited the victim's trial testimony that Defendant Pack spanked her that morning, then Defendant Banks is criminally responsible for the abuse. The evidence supports a finding that Defendant Banks "act[ed] with intent . . . or to promote or assist" Defendant Pack engage in this severe and excessive form of discipline. *See* T.C.A. § 39-11-402(2). The victim testified that Defendant Banks was always present whenever Defendant Pack spanked her, and that she was spanked every day over the course of two or three months. Defendant Banks implicitly condoned this type of discipline being used on her daughter both by allowing it to continue over an extended period of time and by engaging in it herself. The victim testified that on at least one occasion, Defendant Banks spanked her with a comb. Defendant Banks admitted to Sergeant Ray that the victim was disciplined with a white leather belt and a wooden ruler (two of the components of the homemade paddles) and also admitted that, on at least one occasion, she "really whooped [the victim] to get her attention."

On the morning in question, the victim testified that Defendant Banks was present in the home while Defendant Pack was whipping her. The victim testified that she cried and screamed. Defendant Banks then bathed and dressed the victim for school. Several witnesses testified that there was no way a person in that position would not have noticed the injuries on the victim. Defendant Banks admitted that the victim's injuries were the result of discipline. There is no proof that Defendant Banks attempted to prevent Defendant Pack from beating her child and inflicting these injuries. Defendant Banks knew about the victim's injuries and did not seek medical assistance because, as she stated to several people, she did not think the injuries were that bad. Dr. Lakin testified that the victim would have died had she not been treated at the hospital that day because she had lost almost two-thirds of her blood volume due to the massive amount of bruising.

The circumstantial evidence presented to the jury is great and easily led to the reasonable inference that both Defendants either knowingly, other than by accidental means, committed aggravated child abuse as the principal actor or, at a minimum, intentionally solicited, directed, aided, or attempted to aid the other in the commission of the offense. *See* T.C.A. § 39-11-402(2). As explained above, physical participation in the crime is not an essential element under the criminal responsibility theory; encouragement of the principal is enough. *Dorantes*, 331 S.W.3d at 388; *Sherman*, 266 S.W.3d at 408. The State produced substantial evidence that both Defendants participated in the abuse of the victim. From this evidence, a rational jury could find both Defendant Pack or Defendant Banks criminally responsible for the severe abuse inflicted upon the victim, regardless of which one inflicted the actual blows.

*II. Evidentiary Issues*
*A. Testimony of Stephanie Banks*

Defendant Pack argues that the trial court erred in excluding the testimony of Ms. Banks regarding a prior incident of Defendant Banks whipping the victim and leaving bruises. The general rule is that evidence of a defendant's prior conduct is inadmissible, especially when previous crimes or acts are of the same character as the charged offense, because such evidence is irrelevant and "invites the finder of fact to infer guilt from propensity." *State v. Hallock*, 875 S.W.2d 285, 290 (Tenn. Crim. App. 1993). "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait." Tenn. R. Evid. 404(b). "The terms of this rule establish that character evidence cannot be used to prove that a person has a propensity to commit a crime." *State v. McCary*, 119 S.W.3d 226, 243 (Tenn. Crim. App. 2003) (citing *State v. Adkisson*, 899 S.W.2d 626 (Tenn. Crim. App. 1994)). Rule 404(b) has been described as a rule of exclusion rather than inclusion, and "[t]rial courts have been encouraged to take a restrictive approach of Rule 404(b) because 'other act' evidence carries a significant potential for unfairly influencing a jury." *State v. Jones*, 450 S.W.3d 866, 891 (Tenn. 2014) (internal quotation and citation omitted).

However, evidence of other acts may be admissible for other non-propensity purposes, such as "to establish motive, intent, identity, absence of mistake, or common plan or scheme," or "contextual background." *State v. Little*, 402 S.W.3d 202, 210 (Tenn. 2013); *see* Tenn. R. Evid. 404(b), Advisory Comm'n Cmts. Other act evidence may be admitted for these purposes only after the following requirements have been met:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b) (2013).

If the trial court has substantially complied with the procedure mandated by the Rule, a trial court's decision to admit or exclude evidence under Rule 404(b) is reviewed under an abuse of discretion standard. *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997). "A court abuses its discretion when it applies an incorrect legal standard or its decision is illogical or unreasonable, is based on a clearly erroneous assessment of the evidence, or utilizes reasoning that results in injustice to the complaining party." *Jones*, 450 S.W.3d at 892 (quoting *State v. Adams*, 405 S.W.3d 641, 660 (Tenn. 2013)). Where the trial court has failed to substantially comply with the procedural dictates of Rule 404(b), the standard of review is de novo. *State v. Mallard*, 40 S.W.3d 473, 486 n.13 (Tenn. 2001) (citing *DuBose*, 953 S.W.2d at 652-53)).

In this case, the trial court conducted a proper jury-out hearing to determine the admissibility of the proposed testimony. The trial court stated on the record several reasons for excluding Ms. Banks's testimony: that the evidence of the prior act was not clear and convincing; that it was not evidence of a "signature crime" sufficient to serve the non-propensity purpose of establishing the identity of the perpetrator; and that the probative value of the evidence was outweighed by the danger of unfair prejudice. Because the trial court followed the proper procedures, the trial court's decision to exclude Ms. Banks's testimony is entitled to deference and will be reviewed for an abuse of discretion.

A threshold issue for the admission of prior act evidence is whether the evidence of the prior act is clear and convincing. *See DuBose*, 953 S.W.2d at 654. "The clear and convincing evidence standard is more exacting than preponderance of the evidence but less exacting than beyond a reasonable doubt, and it requires that 'there [be] no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" *Jones*, 450 S.W.3d at 893 (quoting *State v. Kennedy*, 152 S.W.3d 16, 18 (Tenn. Crim. App. 2004)). "[W]e may not substitute our own inferences for those drawn by the trial court, which acted as the finder of fact in determining whether the proof of the [prior act] was clear and convincing." *Id.*

The trial court found that the evidence of the prior incident of Defendant Banks whipping the victim was not clear and convincing, and Defendant Pack does not challenge this finding. The trial court found Ms. Banks's testimony not credible. At the time of trial, Ms. Banks claimed to not remember giving a statement to the police that she

had confronted her daughter about bruises on the victim and claimed that she believed the marks to be birthmarks. When her recollection was refreshed with her statement to the police, Ms. Banks admitted that she did not get along with her daughter when she made the statement. There was no medical testimony or other eyewitness testimony to corroborate Ms. Banks's account. We cannot say that the trial court's ruling was "based on a clearly erroneous assessment of the evidence." *See Jones*, 450 S.W.3d at 892. Defendant Pack has not shown that the trial court abused its discretion in finding that the evidence of the prior act was not clear and convincing, and this ground alone is sufficient to exclude the evidence. *See* Tenn. R. Evid. 404(b)(3).

### B. Victim's Medical Records

Both Defendants complain about the admission and exclusion of certain portions of the victim's medical records. Exhibit 36A was a page containing an assessment by a Child Life Specialist and included a statement in which the victim asked if her mother was mad at her. The trial court admitted Exhibit 36A under the business records exception to the hearsay rule over Defendant Banks's objection. Exhibit 36B was a page containing reports from school personnel that the victim disclosed to them that her mother whipped her with a "ruler, belt, and/or paddle." The trial court excluded this portion as inadmissible hearsay within hearsay over the objection of Defendant Pack.

Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). In general, hearsay statements are inadmissible. Tenn. R. Evid. 802. If a hearsay statement contains additional hearsay, both portions must qualify for an exception to the hearsay rule in order to be admissible. Tenn. R. Evid. 805. One such exception is for records "kept in the course of a regularly conducted business activity" if made by "a person with knowledge and a business duty" to make such a record. Tenn. R. Evid. 803(6). Business records are deemed reliable because they are prepared for other uses and are only incidentally prepared for purposes of litigation. *See generally, State v. Clois Dean Asbury*, No. E2008-01641-CCA-R3-CD, 2010 WL 1741365, at *6-9 (Tenn. Crim. App. Apr. 30, 2010), *perm. app. denied* (Tenn. Sept. 21, 2010). Whether a statement constitutes hearsay and whether it falls under one of the exceptions to the hearsay rule "are questions of law subject to a de novo review." *Kendrick v. State*, 454 S.W.3d 450, 479 (Tenn. 2015), *reh'g denied* (Tenn. Feb. 6, 2015).

As to the admission of Exhibit 36A, Defendant Banks argues that there was no showing by the custodian of the records that the victim's medical records were kept in the regular course of business. However, the trial court relied on the jury-out testimony of Dr. Lakin that the records were of the kind regularly kept at the hospital. Nothing in Dr. Lakin's testimony suggests that the person or persons who compiled the records lacked the knowledge to do so. The trial court's "factual findings and credibility determinations in the course of ruling on an evidentiary motion . . . are binding on a reviewing court unless the evidence in the record preponderates against them." *Id.* Additionally, the trial

court offered the option of having Defendant Pack, the proponent of the statements, call the custodian of the records to testify, but neither the State nor Defendant Banks insisted that such be done. *See* Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party . . . who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."). We determine there was no error in the trial court admitting the assessment of the Child Life Specialist contained in Exhibit 36A under the business records exception to the hearsay rule.

However, while hospital records are admissible pursuant to the business records exception to the hearsay rule, not everything contained within the records may be admissible. *State v. Rucker*, 847 S.W.2d 512, 516 (Tenn. Crim. App. 1992). In *Rucker*, this Court held that even though the victim's medical records could be considered under the business records exception, statements made by the victim to her mother and by the mother to the medical personnel contained within the records constituted "double hearsay because [they were] made to a person who then placed the hearsay in the records." *Id.* This Court held that the statements were not admissible under the business records exception because "the declarant, the mother, was not under a duty to transmit the information to either the nurse or the social worker," and proceeded to review the statements under the medical records exception. *Id.*; *see* Tenn. R. Evid. 803(4) (excepting from the hearsay rule "[s]tatements made for purposes of medical diagnosis and treatment. . . .").

Both Exhibit 36A and 36B contain statements made by the victim to hospital personnel in the emergency room, and Exhibit 36B additionally contains statements made by the victim to school personnel, who then relayed those statements to hospital personnel. Even though the hospital personnel were under a business duty to record the victim's statements, those statements still constitute hearsay. *See Rucker*, 847 S.W.2d at 516. To be admissible, those statements must be justified under an exception to the hearsay rule independent of the justification for the document in which they are contained. *See* Tenn. R. Evid. 805. These statements do not qualify under the business records exception because the victim was not under a duty to transmit the information to either the hospital or school personnel. *See Rucker*, 847 S.W.2d at 516. These statements are not admissible under the medical records exception because Dr. Lakin testified that she did not rely on these statements in her diagnosis and treatment of the victim. There was no testimony presented that the statements were made while the victim "was under the stress of excitement caused by [a startling] event or condition" such that they would be admissible under the excited utterance exception. Tenn. R. Evid. 803(2). Therefore, we cannot say that the statements made by the victim—either those made directly to hospital personnel in Exhibits 36A and 36B or those made to school personnel and then relayed to hospital personnel in Exhibit 36B—qualify for an exception to the hearsay rule.

Therefore, we determine that the trial court properly excluded Exhibit 36B. On appeal, Defendant Pack acknowledges the Court's holding in *Rucker*, but now raises a new argument, contending that the statements of the school personnel should qualify for an exception to the hearsay rule because they were required by law to make their disclosures about suspected child abuse and that this legal requirement constituted a business duty similar to that underlying the rationale for the business records exception. However, this particular argument was neither raised in the trial court nor in the motion for new trial. A defendant cannot raise a new argument for the first time on appeal. *State v. Leach*, 148 S.W.3d 42, 55 (Tenn. 2004). Accordingly, this argument has been waived. *See also* Tenn. R. App. P. 36(a). Additionally, this rationale would not apply to the admission of the underlying statements of the victim to the school personnel, which are clearly not covered by the business records exception.[3]

As to Exhibit 36A, the trial court admitted the statements made by the victim, contained within the assessment of the Child Life Specialist, asking if her mother was mad at her or if she was in trouble. As explained above, admission of these statements is not justified under the business records exception to the hearsay rule. However, we deem this error, if any, to be harmless because the statements do not directly implicate Defendant Banks as the perpetrator of the abuse. Defendant Banks argues that the admission of the statements allowed the jury to "draw the inference . . . that [she] knew that the beatings of [the victim] were taking place and failed to do anything about them." However, Defendant Banks's statement to DCS Investigator Cooper—that the reason the victim was in the hospital was "probably due to [the victim's] receiving a spanking that morning before she went to school"—is independent evidence that Defendant Banks knew about the beatings inflicted by Defendant Pack. Furthermore, given the overwhelming evidence in this case, including photographs of the victim's injuries, the victim's testimony that her mother was present when Defendant Pack beat her, and Defendant Banks's admission that she bathed and dressed the victim prior to school that morning, a reasonable jury could find that Defendant Banks could not help but be aware of the victim's injuries and how they came to be inflicted.

*Conclusion*

Based on the foregoing, we affirm the judgments of the trial court.

_____
TIMOTHY L. EASTER, JUDGE

---

[3] Even if we were to conclude that the trial court committed error in excluding the statements of the victim to the school personnel, that error would be harmless because the jury heard the substance of those statements directly from the testimony of the school personnel, which was not objected to at trial.